# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| **UNITED STATES OF AMERICA,** )<br>)<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>**ELTON SIMPSON,** )<br>)<br>)<br>Defendant. )<br>_____) | NO. **CR 10-55 PHX-MHM**<br><br>Phoenix, Arizona<br>October 27, 2010<br>9:47 a.m. |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**(Bench Trial)**

**BEFORE THE HONORABLE MARY H. MURGUIA**

APPEARANCES:

For the Plaintiff:        **Michael T. Morrissey**, Esq.
                          Assistant U.S. Attorney
                          Two Renaissance Square
                          40 N. Central Avenue, Suite 1200
                          Phoenix, Arizona  85004-4408

For the Defendant:        **Gerald A. Williams**, Esq.
                          **Kristina L. Sitton**, Esq.
                          Assistant Federal Public Defenders
                          850 W. Adams Street, Suite 201
                          Phoenix, Arizona  85007

Court Reporter:           Merilyn A. Sanchez, CRR
                          Sandra Day O'Connor U.S. Courthouse
                          401 W. Washington Street SPC-37
                          Phoenix, Arizona  85003-2118
                          (602) 322-7250

Proceedings taken by stenographic court reporter
Transcript prepared by computer-aided transcription

I N D E X

WITNESS:            DIRECT  CROSS  REDIRECT  RECROSS  VD

Dabla Deng
By Mr. Morrissey    208
By Ms. Sitton       218

E X H I B I T S

NO.      DESCRIPTION                          ID    EVD

 8       Tape Compendium                      248


Closing Argument by Mr. Morrissey            265
Closing Argument by Ms. Sitton               288
Final Closing Argument by Mr. Morrissey      299

1                          P R O C E E D I N G S

2

3          THE COURT:  Good morning.  The record should reflect

4    the presence of the defendant, his counsel, and counsel for the

5    United States.                                                    09:47:07

6          Are we ready to resume with the trial?

7          MR. MORRISSEY:  We are, Your Honor.

8          THE COURT:  Okay.

9          MR. MORRISSEY:  The Government calls Dabla Deng.

10         THE COURT:  Please come forward and take the stand.        09:47:23

11         MR. MORRISSEY:  Your Honor?

12         THE COURT:  Yes.

13         MR. MORRISSEY:  Mr. Deng yesterday had trouble hearing

14   over the Court's sound system.  This morning before court, we

15   tried it with the wireless headphones, and it was substantially  09:47:33

16   better, and I would ask that for the portions of the testimony

17   today where we will be playing recordings, that Mr. Deng be

18   permitted to use that wireless headphone.

19         THE COURT:  Of course he may.

20

21

22

23

24

25

1                           DABLA DENG,

2     called as a witness herein, having been previously duly sworn,

3     was examined and testified as follows:

4

5                     DIRECT EXAMINATION (Continued)

6     BY MR. MORRISSEY:

7     Q.  Mr. Deng, I don't think you'll need the headphones for a

8     minute.

9             Mr. Deng, you've been working with the FBI since 2005;

10    is that right?                                              09:48:07

11    A.  Yes.

12    Q.  And for 2005, 2006, 2007, 2008, 2009 and 2010, did the FBI

13    pay you for working with them?

14    A.  Yes.

15    Q.  For all of those years did you file your tax returns?    09:48:28

16    A.  Yes, I did, but last year I didn't, I didn't pay taxes.

17    Q.  Okay.  So for 2009, you did not file a tax return?

18    A.  Yes.

19    Q.  Did you file a tax return, you believe, for 2008?

20    A.  I'm not sure.                                            09:48:59

21    Q.  So it's possible you did not?

22    A.  Yes.

23    Q.  Did you file a tax return for 2007?

24    A.  Yes, sir.

25    Q.  Did you file a tax return for 2006?                      09:49:08

1    A.  Yes, sir.

2    Q.  And did you file a tax return for 2005?

3    A.  Yes.

4    Q.  For the years that you did file a tax return, did you

5    include in your tax return the money that the FBI had paid you?    09:49:28

6    A.  No.

7    Q.  When you would meet with the FBI over the last five years,

8    did they tell you at times that you had to include this money

9    on your tax returns?

10   A.  Yes, they did tell me.                                          09:49:58

11   Q.  But you did not do that when you filed your returns?

12   A.  Yes.

13   Q.  We were talking yesterday about a meeting you had with

14   Mr. Simpson on June 17th, 2009.  I'm going to go back to

15   playing that recording, so you'll want to use your headphones.     09:50:33

16          (A portion of Exhibit No. 3 was played.)

17   BY MR. MORRISSEY:

18   Q.  What did Mr. Simpson just say?

19   A.  The sharia government.

20          THE COURT:  You are going to need to speak into the          09:51:12

21   microphone, sir.  If you could restate it.

22          (A portion of Exhibit No. 3 was played.)

23   BY MR. MORRISSEY:

24   Q.  Mr. Deng, what's the deen?

25   A.  Religion.                                                       09:51:53

1   Q.  Is "deen" an Arabic word?

2   A.  Yes.

3            (A portion of Exhibit No. 3 was played.)

4   BY MR. MORRISSEY:

5   Q.  What did Mr. Simpson just say?  Replay it just a little          09:53:27

6   bit?

7   A.  A little bit.

8            (A portion of Exhibit No. 3 was played.)

9   BY MR. MORRISSEY:

10  Q.  What did he just say?                                            09:53:50

11  A.  If they tell us to do something, to go fight.

12  Q.  Where would the fight be?

13  A.  Can we play that again, please?

14  Q.  Yes.

15           (A portion of Exhibit No. 3 was played.)                    09:54:20

16  BY MR. MORRISSEY:

17  Q.  What did he just say?

18  A.  You go to Iraq.

19           (A portion of Exhibit No. 3 was played.)

20  BY MR. MORRISSEY:                                                    09:54:27

21  Q.  What did Mr. Simpson just say?

22  A.  Bush said it's true.

23           (A portion of Exhibit No. 3 was played.)

24  BY MR. MORRISSEY:

25  Q.  What did he say there?                                           09:57:34

1        THE COURT REPORTER:  I'm sorry, Your Honor, I can't

2   hear him.

3        THE COURT:  Can you speak into the microphone.  Can

4   you test it for me, please.

5        THE WITNESS:  Check.                                    09:57:49

6        THE COURT:  Can you touch it.

7        All right.  You need to speak up.

8        THE WITNESS:  Okay.

9        (A portion of Exhibit No. 3 was played.)

10  BY MR. MORRISSEY:                                            09:57:57

11  Q.  What did Mr. Simpson just say?

12  A.  You be with us or with the Muslim crew.

13       (A portion of Exhibit No. 3 was played.)

14  Q.  Mr. Deng, did you meet with Mr. Simpson on October 23rd,

15  2009?                                                        09:58:57

16  A.  Yes, sir.

17       (A portion of Exhibit No. 4 was played.)

18  BY MR. MORRISSEY:

19  Q.  Mr. Deng, what did you just say?

20  A.  Bouncing soon.                                           10:00:43

21  Q.  That who was going to be bouncing soon?

22  A.  Me.

23       (A portion of Exhibit No. 4 was played.)

24  BY MR. MORRISSEY:

25  Q.  What did Mr. Simpson just say?                           10:01:06

1   A.   Me and Yahya --

2              THE COURT:  Sir, I just need you to speak as loud as

3   you can, please.  Say it again.  What did you just say?

4              THE WITNESS:  I need it rewound a little bit.

5              (A portion of Exhibit No. 4 was played.)          10:01:27

6   BY MR. MORRISSEY:

7   Q.   You need to speak loudly into the microphone.

8   A.   He was saying that me and Yahya was talking about going to

9   South Africa.

10             (A portion of Exhibit No. 4 was played.)          10:01:50

11  BY MR. MORRISSEY:

12  Q.   What did Mr. Simpson just say?

13  A.   Making his way up to Somalia.

14             (A portion of Exhibit No. 4 was played.)

15  BY MR. MORRISSEY:                                            10:01:54

16  Q.   What did Mr. Simpson say?

17  A.   He said if you go to Somalia, and waiting on a brother to

18  pick him up.

19             (A portion of Exhibit No. 4 was played.)

20  BY MR. MORRISSEY:                                            10:02:18

21  Q.   What did you just say?

22  A.   If you come to Sudan, you will be all welcome there.

23             (A portion of Exhibit No. 4 was played.)

24  BY MR. MORRISSEY:

25  Q.   What did Mr. Simpson just say?                          10:02:54

1    A.  Somalia eight country away.

2    Q.  From where?

3    A.  South Africa.

4            (A portion of Exhibit No. 4 was played.)

5    BY MR. MORRISSEY:                                          10:03:05

6    Q.  What word was just said?

7    A.  Shaitan.

8    Q.  Do you know what "shaitan" means?

9    A.  It means devil.

10           (A portion of Exhibit No. 4 was played.)          10:04:21

11   BY MR. MORRISSEY:

12   Q.  Mr. Deng, did you meet with Mr. Simpson on November 7th,

13   2009?

14   A.  Yes, sir.

15           MR. MORRISSEY:  For the record, Your Honor, this tape    10:05:03

16   of November 7, 2009, which is Exhibit 5.  I'm beginning at

17   session one, and at 12:29:15.

18           THE COURT:  All right.

19           (A portion of Exhibit No. 5 was played.)

20   BY MR. MORRISSEY:                                          10:05:26

21   Q.  Who was the last speaker?

22   A.  It's Ally.

23   Q.  Do you know if Ally's name is Roberto Yong?

24   A.  Yes.

25   Q.  But you called him Ally?                               10:06:04

1   A.  Yes.

2   Q.  What did Mr. -- what did Ally just say there?

3           MS. SITTON:  Objection, hearsay.

4           THE COURT:  Just one moment.  Can you rephrase your

5   question, Mr. Morrissey?                                     10:06:23

6           MR. MORRISSEY:  Sure.

7   BY MR. MORRISSEY:

8   Q.  Mr. Deng, the last speaker you identified as Ally?

9   A.  Yes.

10  Q.  Is that right?                                           10:06:31

11  A.  Yes.

12  Q.  What did you hear Mr. Ally say right there?

13          MS. SITTON:  Objection, hearsay.

14          THE COURT:  Overruled.  Are you talking about what he

15  heard him say like what's on the tape, he's relaying what's on  10:06:41

16  the tape?  Am I misunderstanding your objections?

17          MS. SITTON:  Yes, Your Honor, is he trying to bring in

18  a statement of someone who is not going to testify through this

19  witness?  I believe, wouldn't that be hearsay?

20          THE COURT:  But on this tape?                        10:06:58

21          MR. MORRISSEY:  On this recording, what did Mr. Ally

22  just say?

23          THE COURT:  Right.  Overruled.

24          MR. MORRISSEY:  Shall I rewind it?

25          THE WITNESS:  Yeah, rewind, yes.                     10:07:07

1           (A portion of Exhibit No. 5 was played.)

2    BY MR. MORRISSEY:

3    Q.  What did Mr. Ally just say?

4    A.  He said he was trying to roll.

5           (A portion of Exhibit No. 5 was played.)          10:07:24

6    BY MR. MORRISSEY:

7    Q.  Mr. Deng, who was just speaking?

8    A.  Me.

9    Q.  What's the last thing you just said.

10   A.  Mujahid.                                             10:08:11

11   Q.  I'm sorry, could you speak up?

12   A.  Mujahid.

13   Q.  Mujahideen?

14   A.  Mujahid.

15   Q.  And what is a mujahideen?                            10:08:16

16   A.  It's a person who fight.

17          (A portion of Exhibit No. 5 was played.)

18   BY MR. MORRISSEY:

19   Q.  What did Mr. Simpson just say?

20   A.  School is a front.                                   10:08:39

21          (A portion of Exhibit No. 5 was played.)

22   BY MR. MORRISSEY:

23   Q.  What did Mr. Simpson just say?

24   A.  Given the opportunity to bounce.

25          (A portion of Exhibit No. 5 was played.)          10:08:55

1    BY MR. MORRISSEY:

2    Q.  Mr. Deng, by this point, November of 2009, had you, playing

3    your role with the FBI, told the group that you won money?

4           MS. SITTON:  Objection.  Oh, I apologize, withdrawn.

5           THE COURT:  Okay.                                          10:09:33

6           THE WITNESS:  Yes.

7    BY MR. MORRISSEY:

8    Q.  Where did you tell them you had gotten the money from?

9    A.  Won the lottery.

10   Q.  Did you and Mr. Simpson discuss what could be done with      10:09:44

11   that money?

12   A.  Yes.

13   Q.  Can you tell us what Mr. Simpson said about what could be

14   done with that money?

15   A.  To travel with it.                                           10:10:00

16          MR. MORRISSEY:  For the record, this is still November

17   7th, and now we are at 13:23:10 in the conversation.

18          (A portion of Exhibit No. 5 was played.)

19   BY MR. MORRISSEY:

20   Q.  What did Mr. Simpson just say?                               10:11:03

21   A.  Travel.

22          (A portion of Exhibit No. 5 was played.)

23   BY MR. MORRISSEY:

24   Q.  Let me rewind just one part of that.

25          (A portion of Exhibit No. 5 was played.)                  10:12:11

1    BY MR. MORRISSEY:

2    Q.   What did Mr. Simpson just say?

3    A.   Rewind, sir.

4    Q.   I'm sorry?

5    A.   Rewind a little bit.                                    10:12:26

6    Q.   Sure.

7            (A portion of Exhibit No. 5 was played.)

8            THE WITNESS:  They going to try to force you to say

9    something else.

10           (A portion of Exhibit No. 5 was played.)          10:12:54

11   BY MR. MORRISSEY:

12   Q.   What's the last thing that Mr. Simpson just said?

13   A.   Why did you all pick me for --

14   Q.   Speak up, please, louder.

15   A.   Why did you all pick me.                              10:13:35

16           (A portion of Exhibit No. 5 was played.)

17           MR. MORRISSEY:  You can put those away.

18           Your Honor, if I may have one second, please.

19           THE COURT:  Yes.

20           MR. MORRISSEY:  No further questions.             10:14:31

21           THE COURT:  All right.

22           MS. SITTON:  Could you leave that?

23           MR. MORRISSEY:  You want it up?

24           MS. SITTON:  Yeah.

25                                                              10:14:49

1                        CROSS-EXAMINATION

2    BY MS. SITTON:

3    Q.  Good morning.

4    A.  Good morning.

5    Q.  You stated on direct that you speak three languages; is          10:15:14

6    that right?

7    A.  Yes.

8    Q.  Okay.  I'm guessing English isn't your first language?

9    A.  Yes.

10   Q.  What's your first language?          10:15:22

11   A.  Dinka.

12   Q.  Dinka.  That's a native language of Sudan?

13   A.  That the mother -- that's from Sudan.

14   Q.  Okay.  And you also speak Arabic?

15   A.  Yes.  That's the official language of Sudan.          10:15:36

16   Q.  And when did you learn English?

17   A.  In here.

18   Q.  Okay.  So in the past ten years since you've been here?

19   A.  Yes.

20   Q.  I just noticed that you seem to be struggling a little bit          10:15:45

21   with English.  Is that fair to say?

22   A.  Yes.

23   Q.  So you don't always understand sometimes some of the

24   questions that are being asked?

25   A.  Yes.          10:15:54

1  Q.  Okay.  Now, on direct, Mr. Morrissey was playing a clip and

2  he asked you what country we were in and you answered Somalia.

3  You know we are not in Somalia, right?

4  A.  Yeah, that was -- yes, I didn't understand that.  That's

5  why I answered that.                                          10:16:18

6  Q.  So you just didn't understand him when you answered that?

7  A.  Yes.

8  Q.  And I think another time when he asked you what country you

9  said Arizona.  You didn't understand him on that one as well?

10 A.  Yes, I understand.  He say where we in and I said Arizona,   10:16:30

11 so --.

12 Q.  Okay.  So you -- so you come from Sudan.  And you were --

13 you're Christian, right?

14 A.  Yes.

15 Q.  And in the Sudan, you testified that Muslims torture the     10:16:45

16 Christians there?

17 A.  Yes.

18 Q.  So you -- so you don't like Muslims?

19 A.  It's not I don't like Muslims, but the truth is truth.  I

20 see what I see.  And that's my country, so --.                 10:17:01

21 Q.  Well, you offered your services to Agent Hebert because you

22 don't like Muslims?

23 A.  No.  Because I was interested.

24 Q.  Because you were interested?

25 A.  Yes.                                                        10:17:15

1   Q.  And because of the money, right?

2   A.  I didn't do it because of the money.

3   Q.  You made -- you made quite a significant amount of money

4   during this time, right?

5   A.  Yes.                                                    10:17:30

6   Q.  In 2008, for example, you made $33,000, right, from the

7   FBI?

8   A.  Yes.

9   Q.  And that wasn't just your sole income.  You were working

10  other jobs, too?                                           10:17:45

11  A.  Yes.

12  Q.  And in 2009, you made $42,000?

13  A.  Yes.

14  Q.  And was that not your sole income?

15  A.  I can't remember exactly.                              10:18:00

16  Q.  2008?

17  A.  I don't remember.

18  Q.  You don't remember?

19          And in 2009, you made $42,000.  Sound about right?

20  A.  Yes.                                                   10:18:14

21  Q.  And you were getting paid based on the information that you

22  were bringing to Agent Hebert, right?

23  A.  Yes.

24  Q.  So if he was happy with the information that you were

25  bringing him, then you made more money?                    10:18:32

1    A.  Yes.

2    Q.  And if you continued to bring him information, then you

3    would get more money every time, right?

4    A.  That's not the case.

5    Q.  That's not the case?  He stopped giving you money?        10:18:45

6    A.  Could you repeat again?

7    Q.  If you continued to give him information, then you would

8    continue to get more money?

9    A.  You can say that.

10   Q.  Is it true?                                               10:18:58

11   A.  Yes.

12   Q.  Okay.  Mr. Morrissey asked you on direct whether you

13   watched any videos with Mr. Simpson.  You were acquainted with

14   him for -- you were following him for about three years, right?

15   A.  More.                                                     10:19:20

16   Q.  Longer than three years.  Is that -- does that sound about

17   right?

18   A.  Can you repeat again?

19   Q.  You were -- for longer than three years?

20   A.  Repeat the question.                                      10:19:29

21   Q.  You were acquainted with him for longer than three years?

22   A.  What's "acquainted" mean?

23   Q.  You got to know him and you hung out with him for more than

24   three years?

25   A.  Yes.                                                      10:19:43

1    Q.  Okay.  But you start recording conversations in 2006.  Does
2    that sound right?
3    A.  Yes.
4    Q.  Okay.  And you were continuously recording conversations
5    with him throughout 2007?                                        10:19:59
6    A.  Yes.
7    Q.  And 2008?
8    A.  Yes.
9    Q.  And 2009?
10   A.  Yes.                                                         10:20:04
11   Q.  In all, you recorded about -- over 300 conversations,
12   didn't you?
13   A.  I can't remember exactly how many, but maybe.
14   Q.  Would you argue with me if I said about 330 conversations?
15   Sound about right?                                               10:20:21
16   A.  Maybe, yes.
17   Q.  Okay.  And those weren't just short six-minute
18   conversations, were they, that you were recording?
19   A.  Long.
20   Q.  They were long ones, right, two and a half, three, four,     10:20:36
21   five hours?
22   A.  Yes.
23   Q.  So these six minutes or three minutes that the Government
24   is offering, those weren't your entire conversations.  Those
25   were small portions of conversations; is that right?            10:20:49

1   A.  Repeat.

2   Q.  Sure.  The small snippets that the Government is giving,

3   the small little bits of conversation that we are hearing over

4   the loud speaker.

5   A.  Yes.                                                    10:21:05

6   Q.  Those are -- those are just little bits of conversation,

7   right?  A couple minutes?

8   A.  It's a part of a conversation, yes.

9   Q.  So you watched videos with Mr. Simpson.  You watched a

10  video and you said it had to do with jihad?                 10:21:22

11  A.  Yes.

12  Q.  Tell us more about those videos.

13  A.  We watched a lot of videos also, and also DVDs also.

14  Q.  DVDs like Transformers?

15  A.  No.  It was talking about jihad and talk about a lot of  10:21:40

16  stuff.

17  Q.  It talked about a lot of stuff, right?  It talked about

18  9-11?

19  A.  We watched that video, too.

20  Q.  And it talked about -- it talked about what was going on in 10:21:54

21  Muslim countries, right?

22  A.  Yes.

23  Q.  Kind of like the news?  Did you watch the news?

24  A.  Yes.

25  Q.  Okay.  And the news can -- here in America it portrays     10:22:13

1  what's going on in the country, right?

2  A.  Well, I don't know about that.

3  Q.  You watch the news, but you don't know what --

4  A.  You just said that something about American stuff like

5  that.  I'm not from here first off, so I don't know what's          10:22:37

6  going on, so --.

7  Q.  Okay.  So you watched different videos with Mr. Simpson.

8  In fact, you watched a video with him on July 4th, 2007, about

9  lizards and birds, didn't you?

10  A.  I don't remember exactly.          10:22:57

11  Q.  You don't remember?

12        You reported to Agent Hebert that on July 4, 2007, you

13  watched a video about lizards and birds.  Do you remember that?

14  A.  I remember a video that I watched about ants.

15  Q.  Okay.  And you watched movies with him as well, DVDs?          10:23:20

16  A.  Sometimes.  But no movies.

17  Q.  Okay, because you were with him a lot.  So you did lots of

18  things together?

19  A.  Yes.

20  Q.  You went to eat a lot?          10:23:36

21  A.  Yes.

22  Q.  A lot.  You went together a lot.

23        You talked about a lot of stuff, didn't you?

24  A.  Yes.

25  Q.  And you talked about Islam in particular quite a bit,          10:23:45

1   right?

2   A.  Talk a lot.

3   Q.  I'm sorry?

4   A.  We talk a lot about Islam, too.

5   Q.  And that's because you were telling Mr. Simpson that you        10:23:57

6   were a new convert to Islam, right?

7   A.  Yes.

8   Q.  And that you wanted him to teach you about Islam?

9   A.  Yes.

10  Q.  And he knew a lot?        10:24:08

11  A.  Yes.

12  Q.  And he talked a lot?

13  A.  Yes.

14  Q.  And he talked a lot about the history of Islam?

15  A.  He talked and --.        10:24:20

16  Q.  For example, the Government just played you a clip of June

17  17th.  Mr. Simpson was talking about the caliphate.  Do you

18  remember that?  He was talking about Abu Bakr?

19  A.  Yes.

20  Q.  Do you remember him teaching you about that?        10:24:55

21  A.  Yes.

22  Q.  And in fact, in the tape, he talks about how Abu Bakr is an

23  ancient prophet, right?  Like we were living in Abu Bakr time,

24  that's because Abu Bakr isn't living right now, right?  Did he

25  teach you that?        10:25:21

1   A.  We talk about it, yes.

2   Q.  Okay.  So he was giving you a hypothetical, like if we were

3   living back when Abu Bakr presided or was a prophet in Islam.

4   That's not now.  Abu Bakr is not a prophet in Islam now, is he?

5        You don't know?                                              10:25:56

6   A.  I don't know.

7   Q.  Do you know that Mr. Simpson was teaching you about the

8   caliph, an ancient form of Muslim government?  Did you

9   understand that?

10  A.  No.                                                           10:26:10

11  Q.  Okay.  So you don't always understand what you're being

12  taught?

13  A.  I understand.

14  Q.  Okay.  Maybe I can play the clip again.  I don't know if I

15  know exactly how to work it.                                      10:26:21

16        MS. SITTON:  May I have one moment?

17        THE COURT:  You may.

18        (A portion of a tape was played.)

19  BY MS. SITTON:

20  Q.  Maybe I asked the question incorrectly.  I don't know how     10:28:34

21  this is working, so I'm not going to waste the Court's time.

22        Abu Bakr is one of the companions of the prophet

23  Mohammed, right?

24  A.  From what he told me, yes.

25  Q.  So when he's talking about living in Abu Bakr time, and Abu   10:28:57

1   Bakr telling us what to do, he's not talking about doing

2   anything now.  He's talking -- he's teaching you about then.

3   Does that sound right?

4          Do you not understand?

5   A.  Do you want to repeat?                                    10:29:24

6   Q.  Sure.  When he's talking about -- when Mr. Simpson is

7   talking about Abu Bakr.

8          MR. MORRISSEY:  Your Honor, I am sorry to interrupt

9   counsel's presentation.  May I have one moment with counsel?

10         THE COURT:  Yes.                                        10:29:35

11         MS. SITTON:  I'm going to play you what you've already

12  identified as June 17, 2009 recording.  And for the record,

13  it's the third clip.

14         (A portion of a tape was played.)

15  BY MS. SITTON:                                                 10:30:40

16  Q.  Can you hear it or do you want to put your headphones on?

17  A.  I just heard it.

18  Q.  Can you hear it well enough or do you want to put the head

19  phones on?

20         (A portion of a tape was played.)                       10:30:49

21  BY MS. SITTON:

22  Q.  Did you hear what Mr. Simpson said there?

23  A.  Yes.

24  Q.  What?

25  A.  Abu Bakr.                                                  10:31:03

1   Q.  What about Abu Bakr, can you hear him?

2   A.  Rewound a little bit, please.

3   Q.  Sure.

4           (A portion of a tape was played.)

5   BY MS. SITTON:                                          10:31:27

6   Q.  Could you hear it better?

7   A.  Yes.

8   Q.  What did he say?

9   A.  Abu Bakr was the caliph.

10  Q.  He was the caliph?                                  10:31:32

11  A.  Yes.

12  Q.  Not he is the caliph.  Not he is currently.  Maybe if you

13  take them out.

14  A.  No, he's --

15  Q.  He's not currently?                                10:31:44

16  A.  Yes.

17  Q.  We will play a little bit more.

18          (A portion of a tape was played.)

19  BY MS. SITTON:

20  Q.  Did you hear what he just said?                     10:33:22

21  A.  Yes.

22  Q.  What did he just say?

23  A.  Abu Bakr give you the order.

24  Q.  Isn't it true that he just said like if we were living in

25  Abu Bakr time, Abu Bakr would have been our caliph?    10:33:40

1  A.  Yes.

2  Q.  And then he just said, and if Abu Bakr give you an order to

3  do something, you'd have to do it?  Sound right?

4  A.  Yes.

5          (A portion of a tape was played.)                    10:34:08

6  BY MS. SITTON:

7  Q.  Unless he tells you to do something bad, right?  Does that

8  sound right?

9  A.  Yes.

10  Q.  So he was teaching you in that clip, he was teaching you     10:34:21

11  about Islam.  Sound right?

12  A.  Yes.

13  Q.  And, in fact, that was -- a lot of your conversation was

14  him teaching you about Islam?

15  A.  We talk a lot more like he mentioned that there was 300 CDs  10:34:52

16  or more, right?

17  Q.  Right.

18  A.  Tapes.

19  Q.  But he was kind of preaching to you, right?

20          Do you know what preaching is?                         10:35:09

21  A.  Yeah.

22  Q.  Did you go to church in Sudan?

23  A.  Yes.

24  Q.  Okay.  You said you were a Christian?

25  A.  Yes.                                                        10:35:18

1    Q.  Do they have -- they have churches?  Did you go regularly?

2    A.  What's churches?

3    Q.  Church.  Where you go and practice Christianity.

4    A.  Oh, yes.

5    Q.  Okay.  Did you study Christianity?                          10:35:28

6    A.  Yes.

7    Q.  And Christianity is a religion.  And did you study the

8    history of the religion?

9            MR. MORRISSEY:  Objection, relevance.

10           THE COURT:  Overruled, I'll allow it.                   10:35:51

11           You may answer.

12           You may answer.

13           THE WITNESS:  No.

14   BY MS. SITTON:

15   Q.  Did you learn one of the basic tenets of Christianity being  10:36:06

16   the crucifixion of Jesus?

17   A.  Yes.

18   Q.  It's pretty violent, isn't it, someone being nailed to a

19   cross?  Is that -- do you think that's kind of violent?

20   A.  I need time out.                                            10:36:27

21   Q.  I'm sorry?

22   A.  I need time out.

23           MR. MORRISSEY:  Oh, Your Honor, as I understand the

24   witness, he's asking for a break.

25           THE COURT:  I need to ask you, do you need to go to     10:36:39

1    the bathroom?  Why do you need time out?

2              THE WITNESS:  To drink some water.

3              THE COURT:  There's some water right there.

4              THE WITNESS:  Thank you.

5    BY MS. SITTON:                                            10:37:12

6    Q.  Sure.  I was asking you about whether the crucifixion of

7    Jesus and Christianity is violent.

8    A.  I don't know.

9    Q.  You know what the crucifixion is when Jesus was nailed to

10   the cross?  That was part of Christianity.                10:37:28

11             MR. MORRISSEY:  Objection, asked and answered.

12             THE COURT:  It was -- then we had the break.  So I'm

13   going to allow her to reestablish where she was.  So overruled.

14   You may proceed.

15   BY MR. WILLIAMS:                                          10:37:41

16   Q.  You learned -- you testified just before that you learned

17   about, you studied Christianity, the history of the religion.

18             MR. MORRISSEY:  Objection, misstates the testimony.

19             THE COURT:  That -- sustained.

20   BY MS. SITTON:                                            10:38:03

21   Q.  You testified that you knew about Jesus' crucifixion.  You

22   know a little about that?

23   A.  I said I'm a Christian.  But I never testified about

24   Jesus --

25   Q.  Do you know about the crucifixion?                    10:38:16

1   A.   No.

2   Q.   Jesus dying on the cross?

3   A.   That's what the Bible say.

4   Q.   So you do know about -- yeah, so why don't you take those

5   off.                                                              10:38:43

6        Do you know what crucifixion is?

7        MR. MORRISSEY:  Objection, relevance.

8        MS. SITTON:  The relevance is what he's talking about

9   being taught about the history of Islam.  And I'm asking him

10  whether or not -- and they are trying to portray it as being    10:38:55

11  violent.  I'm trying to show that -- that it's just him

12  being -- that it's just him teaching.

13       THE COURT:  I'll allow it.  You may proceed.

14  BY MS. SITTON:

15  Q.   Crucifixion is being nailed to a cross, right?  Jesus was  10:39:13

16  nailed to a cross in Christianity?

17  A.   Yes.

18  Q.   That's pretty violent?

19  A.   I don't know about that.

20  Q.   Let's talk about something else.  I notice you have a      10:39:26

21  necklace of Africa on your neck?

22  A.   Yes.

23  Q.   I'm going to --

24       MS. SITTON:  Can the witness be shown Exhibit 100.

25       THE COURT:  Yes.                                            10:39:55

1    BY MS. SITTON:

2    Q.  Can you open that and look at it?

3            Do you know what that is?

4    A.  It's African map.

5    Q.  And have you -- do you recognize that as being accurate, to        10:40:10

6    the best of your knowledge?

7    A.  Yes.

8    Q.  Okay.  And you're from somewhere in Africa, correct?

9    A.  Yes.

10           MS. SITTON:  Your Honor, I would move to have Exhibit        10:40:34

11   100 into evidence.

12           MR. MORRISSEY:  No objection.

13           THE COURT:  It's admitted.

14           MS. SITTON:  Your Honor, may we publish?

15           THE COURT:  You may.                                         10:40:41

16           She has it on her computer, so we just need to -- turn

17   on the Elmo there.  Is it on over there?

18           THE PARALEGAL:  We need to have it displayed on our

19   screen.

20           MS. SITTON:  Your Honor, she has it on the screen.        10:41:09

21           THE COURT:  So it's not on the Elmo, it's on the

22   screen.  It's on.

23   BY MS. SITTON:

24   Q.  Okay.  You're from Sudan, and that's in the middle kind of

25   the north; is that right?                                          10:41:37

1    A.  Yes.

2    Q.  Have you ever traveled to Somalia from Sudan?

3    A.  No.

4    Q.  Is that a long distance?

5    A.  Kind of.                                          10:42:09

6    Q.  Do you have any idea how long it would take to get that

7    distance?

8    A.  I don't know.

9    Q.  Ever been to South Africa?

10   A.  No.                                               10:42:21

11   Q.  Do you see Ghana on the map?

12   A.  Can you show me?

13   Q.  Do you see it right there?

14   A.  Yes.

15   Q.  That's even -- that's even farther away from Somalia than    10:42:44

16   Sudan is, isn't it?

17   A.  Yes.

18   Q.  In one of the clips, you heard Mr. Simpson talk about

19   knowing someone in Ghana?

20   A.  Yes.                                              10:43:24

21   Q.  That's quite a distance away from Somalia, right?

22   A.  Yes.

23   Q.  Africa is a very large continent?

24   A.  Yes.

25   Q.  And I believe you were looking at a clip and you heard, you   10:43:48

1   testified that Mr. Simpson said, "We know plenty of brothers

2   from Somalia."

3   A.  Yes.

4   Q.  What are some of the names of those people that Mr. Simpson

5   knows?                                                          10:44:01

6        MR. MORRISSEY:  Objection, calls for speculation.

7        MS. SITTON:  If he knows.

8        THE COURT:  If he knows, do you know?

9        THE WITNESS:  I forget it now, but if I can see them.

10  BY MS. SITTON:                                                  10:44:12

11  Q.  So one person?

12  A.  You talking about here?

13  Q.  Right.

14  A.  I know the masjid, and there was plenty of people, I mean,

15  plenty that I know that we used to go to the masjid at 32nd     10:44:32

16  Street.

17  Q.  Okay.  What are their names?

18  A.  I don't know all their names.

19  Q.  So you know who they are, but you don't know their names?

20  A.  In here you're talking about?                               10:44:48

21  Q.  Right.

22  A.  Yes.

23  Q.  And you're talking about the 32nd mosque.  That's not the

24  mosque that Mr. Simpson attended, though?

25  A.  We go there sometime also.                                  10:45:05

1    Q.   Okay.  Yes.  On May 29, on May 29, you talked about jihad.

2    Does that sound about right?

3    A.   Yes.

4    Q.   And you said jihad isn't necessarily violent?

5           MR. MORRISSEY:  Objection, misstates the testimony.          10:45:37

6           MS. SITTON:  We can play it.

7           THE COURT:  Why don't you play it.

8           (A portion of a tape was played.)

9    BY MS. SITTON:

10   Q.   We just listened to quite a long portion of this.  Has          10:50:32

11   Mr. Simpson brought up anything about jihad so far in this

12   conversation?  Has he said the word "jihad"?

13   A.   There was one talking about battlefield there.

14   Q.   I'm sorry?

15   A.   Battlefield.          10:50:48

16   Q.   He hasn't said the word "jihad," though, correct?

17   A.   You have to listen again to it.

18   Q.   You just listened to that, and you didn't hear him say the

19   word "jihad" yet, did you?

20   A.   I'm confused.          10:51:08

21   Q.   I'm not going to play it again.  The -- you stated in this

22   clip on May 29th that jihad is not bad, right?  Do you remember

23   that?

24   A.   Yes.

25   Q.   And that's because in the Muslim religion, jihad isn't          10:51:46

1  necessarily bad, right?

2  A.  I was told by the FBI --

3  Q.  Don't tell me what the FBI told you.  Jihad isn't

4  necessarily bad, right?  You were taught that by Mr. Simpson?

5  A.  Jihad is bad.                                          10:52:10

6  Q.  You -- I guess we will play more of this clip.  This is the

7  May 29th clip again.

8          (A portion of a tape was played.)

9  BY MS. SITTON:

10  Q.  That was you saying they were talking about jihad this     10:52:53

11  morning, right?

12  A.  Yes.

13  Q.  And you are the first person that actually brings up jihad

14  on this clip on May 29th, aren't you?

15  A.  I don't remember exactly.                              10:53:04

16  Q.  I'm sorry?

17  A.  I don't remember exactly.

18          MS. SITTON:  I can't hear what he's saying.

19          THE COURT:  Can you repeat it and speak up.

20          THE WITNESS:  I didn't remember.                   10:53:12

21          (A portion of a tape was played.)

22  BY MS. SITTON:

23  Q.  Did you hear what Mr. Simpson said?  He said, "What was

24  they talking about?"

25  A.  Yes.                                                   10:53:43

1    Q.  So he didn't hear anybody talk about jihad.  You were the

2    one that brought it up, right?  And you were the one that heard

3    that?

4    A.  Everybody heard that.

5    Q.  This clip that the Government played, Mr. Morrissey, on May          10:54:25

6    29th, do you remember that conversation?

7    A.  Say that again?

8    Q.  Do you remember being with Mr. Simpson on that day?  You

9    can take the earphones off.

10   A.  Yes.                                                                  10:54:42

11   Q.  And you remember that the time that you -- that -- the

12   total amount of time that you were with him was over five

13   hours.  Do you remember that?

14   A.  I can't remember exactly, but maybe.

15   Q.  And this clip that the Government is playing is about eight          10:54:59

16   minutes; is that about right?  I'm asking if that sounds about

17   right.

18   A.  Yes.

19   Q.  So it's quite a small amount of your conversation that day?

20   A.  Repeat?                                                              10:55:21

21   Q.  It's quite a small amount of your conversation that day?

22   A.  Yes.

23   Q.  And the Government played a clip of June 17th, 2009?

24   A.  Yes.

25   Q.  They played about eight minutes of that.  That was when             10:55:42

1  they were talking about the caliphate?

2  A.  Yes.

3  Q.  Do you remember that conversation?

4  A.  Do you want to play it?

5  Q.  Well, do you -- I'm asking if you remember that          10:56:01

6  conversation.

7  A.  We talk a lot -- we have a lot of conversations.

8  Q.  Okay.  You have a lot of conversations.  And you don't

9  always understand everything that he's saying, do you?

10 A.  I understand most of it.          10:56:21

11 Q.  Okay.  You don't understand a lot of -- you don't

12 understand some of what I'm saying, right?

13 A.  That's why I ask you to repeat yourself.

14 Q.  Okay.  You never went and bought any guns with Mr. Simpson,

15 right?          10:56:52

16 A.  We did buy one gun with -- actually, it was three of us.

17 Q.  You didn't ever buy any ticket to Somalia?

18 A.  No.

19 Q.  You never spoke with any Somalian about going over and

20 fighting jihad?          10:57:15

21 A.  Repeat?

22 Q.  You didn't ever speak with any person from Somalia about

23 going and you didn't make any plans to go and fight jihad in

24 Somalia?

25 A.  Repeat that?          10:57:30

1   Q.  You and Mr. Simpson never made any plans to go to Somalia.

2   You never made any firm plans to go to Somalia and go and fight

3   jihad?

4   A.  We talk about it.

5   Q.  Did you ever make any steps toward it?                    10:57:44

6   A.  Repeat again.

7   Q.  You never took any steps to do that, did you?  Never bought

8   a plane ticket to Somalia?

9   A.  No.

10  Q.  Never tried to get out of your lease so that you could get  10:58:07

11  an apartment to go to Somalia?

12  A.  No.

13  Q.  Never tried to actually get there.  You just talked about

14  it, right?  Talked about Somalia?

15  A.  Yes.                                                       10:58:39

16  Q.  Same with Palestine?

17  A.  Yes.

18  Q.  Same way you talked about Iran?

19  A.  Yes.

20  Q.  Same way you talked about Iraq?                            10:58:48

21  A.  Yes.

22  Q.  Ever make any plans to go to any of those countries?

23  A.  We been talking about it.

24  Q.  Besides talking about it, you never took any steps --

25  A.  No.                                                        10:59:04

1   Q.  -- to actually do that?

2   A.  No.

3   Q.  Just a couple more questions.  You had talked about selling

4   your car on May 29th.  You never did that, right?

5   A.  Yes.  Repeat again?                                        11:00:58

6   Q.  You -- I'll be more clear.  On May 29th, you heard talk --

7   you heard Mr. Simpson talking about you could sell your car and

8   that's a plane ticket.  You never sold your car to get a plane

9   ticket out of the country, right?

10  A.  I don't remember that.                                     11:01:19

11  Q.  You don't remember Mr. Simpson -- the clip of Mr. Simpson

12  saying you could sell your car and that's a plane ticket right

13  there?

14  A.  I don't remember that.

15  Q.  But you never sold your car to get a plane ticket out of   11:01:34

16  the country?

17  A.  No.  I never went out of the country.

18  Q.  I'm just going to ask you a couple more questions about the

19  money that you got.  You testified that you got over $132,000

20  from the FBI.  And you knew that you had to pay taxes on that,  11:02:08

21  right?

22  A.  Yes.

23  Q.  And they told you to pay taxes on it?

24  A.  They told me that you can report the taxes.

25  Q.  And so --                                                  11:02:28

1    A.  Like to claim them.

2    Q.  I'm sorry?

3    A.  To claim them, the taxes.

4    Q.  And you didn't?

5    A.  I didn't.                                          11:02:34

6           MS. SITTON:  I have no further questions.

7           THE COURT:  We are going to take a recess before any

8    redirect.

9           Before we do, it's been testified that English is not

10   Mr. Deng's native language.  Did the Government consider      11:02:53

11   perhaps an interpreter?  It looks like he has struggled

12   somewhat with the language, with the English language, and with

13   the testimony.  So did you consider that?

14          MR. MORRISSEY:  No, Your Honor.  I disagree with the

15   Court's statement.  I think you can tell from the recordings    11:03:13

16   he's quite proficient in English.  I've seen difficulties come

17   from --

18          THE COURT:  Well --

19          MR. MORRISSEY:  -- his --

20          THE COURT:  I didn't say from the recordings.  I said    11:03:22

21   from his testimony.  And I'm just asking.  You can make your

22   argument later.  But apparently you didn't think it was

23   necessary.

24          MR. MORRISSEY:  That's correct.

25          THE COURT:  All right.  We will be in recess for about   11:03:35

1    15 minutes.  Thank you.

2            (A recess was taken.)

3            THE COURTROOM DEPUTY CLERK:  Court is now in session.

4            THE COURT:  All right.  Thank you.  The record should

5    reflect the presence of the defendant, his counsel, counsel for    11:22:17

6    the United States.

7            You all may be seated.  We are ready to resume.

8            Mr. Morrissey, you may redirect.

9            MR. MORRISSEY:  I do not have redirect for this

10   witness, Your Honor.                                               11:22:27

11           THE COURT:  All right.

12           MR. MORRISSEY:  May the witness be excused?

13           THE COURT:  Yes.

14           You may step down.

15           MR. MORRISSEY:  And, Your Honor, just to clarify, the      11:22:33

16   witness is not under subpoena by the defense.  May he be

17   permitted to be excused from these proceedings?

18           MS. SITTON:  Yes.

19           THE COURT:  All right.

20           Mr. Mitchell, thank you.  You are excused, too.            11:22:59

21           MR. MITCHELL:  Thank you, Judge.

22           MR. MORRISSEY:  Your Honor, the Government at this

23   point would make a request to withdraw Exhibit 6, which is in

24   evidence, but it has not been played.  And the Government does

25   not wish it to be part of the Court's consideration of the         11:23:17

1  factual and legal issues.

2          THE COURT:  What is Number 6 entitled?

3          MR. MORRISSEY:  Recording April 2nd, 2007.

4          THE COURT:  All right.  Any objection?

5          MS. SITTON:  No, Your Honor.                    11:23:39

6          THE COURT:  Okay.  It is withdrawn.

7          MR. MORRISSEY:  Your Honor, the Government offers

8  Exhibit 8, which is a omnibus recording that contains all of

9  the clips played by the Government in the course of its case in

10 chief.                                                 11:23:59

11         If the Court needed to consider recordings and wanted

12 to consider that which the Government played rather than the

13 entirety of the day, Exhibit 8 would be of use to the Court.

14 The Government offers this for admission.

15         THE COURT:  All right.  Any objection?          11:24:15

16         MS. SITTON:  No objection.

17         THE COURT:  All right, it's admitted.

18         MR. MORRISSEY:  May I approach your clerk?

19         THE COURT:  You may.

20         MR. MORRISSEY:  Your Honor, the Government rests.  11:24:32

21         THE COURT:  All right.  Mr. Williams?

22         MR. WILLIAMS:  Your Honor, we would like to make a

23 motion pursuant to Rule 29.

24         THE COURT:  Proceed.

25         MR. WILLIAMS:  Your Honor, we feel that the        11:24:58

1    Government -- that there's two issues that is before Your Honor

2    in this case.  One is whether or not a false statement has been

3    made, and whether or not that false statement involves

4    terrorism.  And we believe the evidence is insufficient in both

5    regards.                                                          11:25:16

6           In terms of terrorism, there's no evidence presented

7    at all that Mr. Simpson or the individuals that he associated

8    with were actually involved in international terrorism as

9    defined by statute.

10          And, in fact, their testimony -- or the testimony is      11:25:33

11   that they were merely discussing issues of either political or

12   religious nature.  They have a First Amendment right to do

13   that.  There is no indication that there was any attempt made,

14   there are no charges made.  And, in fact, I think the evidence

15   was so slight that they were involved in terrorism, the FBI      11:25:52

16   were unable to get Mr. Simpson on the no-fly list.

17          And so based on the evidence that's presented in the

18   clips, and we would ask the Court to consider not only the

19   snippets that were presented by the Government, but the

20   entirety of the recordings.  And it would be clear at that       11:26:09

21   point that a lot of the things that were being discussed were

22   merely just rhetoric and just talk about the issues of Islam.

23          As Mr. Deng had indicated and the Government indicated

24   as well, he ingratiated himself with Mr. Simpson with the ruse

25   that he was seeking to become Muslim, was looking for            11:26:31

1  instruction in the word -- in the ways of Islam.  And that was

2  predominantly the entirety of the conversation that lasted over

3  a three-year period that included over 300 interviews or

4  recordings and over thousands and thousands of hours.

5          And so we feel that the Government has failed in that          11:26:55

6  regard and that if the Court is to consider whether or not a

7  1001 violation has occurred, that it should be strictly for a

8  false statement and one that does not include the enhancement.

9          In terms of the false statement itself, there is one

10  statement that the Government -- or we submit that the          11:27:15

11  Government is arguing that Mr. Simpson made, and it relates to

12  the charges, and that is "no," that he indicated no.  And then

13  the question becomes what the -- the answer is no.  And the

14  issue becomes what the question is.  The Government's witnesses

15  could not agree on what was asked of Mr. Simpson.          11:27:35

16          Mr. -- or Agent Hebert himself testified at least at

17  the grand jury he misspoke about the question that he asked

18  Mr. Simpson.  And particularly, he says specifically there was

19  a "yes" or "no" question that involved a compound question.  He

20  indicates that he misspoke.          11:27:54

21          We believe that his testimony is incredible, because

22  at the time of the grand jury, it is our position that he was

23  simply saying what he had to say to get a grand jury

24  indictment.

25          He then testified at a detention hearing where he now          11:28:08

1  testified that he misspoke again, indicates that he had made

2  statements or questions to Mr. Simpson about what his plans

3  were or what his discussions were.  That was an attempt to get

4  Mr. Simpson detained.

5       Now before Your Honor, in an attempt to get                 11:28:28

6  Mr. Simpson convicted, he now testifies that different

7  statements were made to Mr. Simpson.

8       His statements in regards to what happened that day is

9  completely different than Agent Turner testified.  He testified

10 that Agent Turner asked him several times whether or not he had  11:28:49

11 discussions about traveling to Somalia, that he did not deny

12 that he had those discussions, that he just simply did not

13 answer them directly.

14      He then indicated that he had asked Mr. Simpson a

15 "yes" or "no" question to whether or not Mr. Simpson had         11:29:07

16 traveled to Somalia and indicated at that point, Mr. Simpson

17 said "no."  Different than the testimony of Agent Turner, who

18 indicated that he did not ask Mr. Simpson whether or not he had

19 discussions regarding travel to Somalia, and that he only

20 addressed the issue of whether or not he was planning to travel  11:29:25

21 to South Africa and travel related to South Africa.

22      He then indicated, and actually finished the testimony

23 with the question being asked to Simpson by Agent Hebert

24 whether Mr. Simpson had planned to travel to Somalia with

25 others.  And there's no indication that that statement is a      11:29:48

1 false statement.  I don't believe that they can agree as to

2 what the false statement is.  And as a result, we believe that

3 there is insufficient evidence for a trier of fact to consider

4 any further evidence.  And, again, we would be moving for

5 dismissal pursuant to Rule 29.  11:30:06

6   THE COURT:  Hold on just a second.  Let me just ask

7 you a couple of questions.  You say to look at the entire

8 recordings of each of the days.  The exhibits have been

9 submitted that relate to the recordings.  And let me just ask

10 Mr. Morrissey.  What are they, those exhibits that relate to 11:30:30

11 the recordings?

12   MR. MORRISSEY:  Your Honor, you have Exhibits 1

13 through 5, which would be the entirety of individual days.  And

14 I -- if you want specificity, I can say Exhibit 1 is July 31st,

15 2007.  Should I continue?  11:30:51

16   THE COURT:  Yes.

17   MR. MORRISSEY:  Exhibit 2 is May 29th, 2009.

18 Exhibit 3 is June 17th, 2009.  Exhibit 4 is October 23rd, 2009.

19 Exhibit 5 is November 7, 2009.  And Exhibit 8 is the compendium

20 of those -- of that which was played by the Government. 11:31:23

21   I should note if the Court played Exhibits 1, 2, 3, 4,

22 and 5, it would hear that which we did not play in court.

23 There were portions not played in court.  Nonetheless, the

24 entire day, an exhibit, was admitted.

25   THE COURT:  Okay.  Thank you.  My question for you, 11:31:42

1  Mr. Williams, what is it in particular that you would like

2  to -- for me to focus on with respect to the recordings of that

3  day.  And also, is there any particular language that you

4  challenge?

5         That didn't really come out.  Maybe you are going to          11:32:06

6  have something in your case here when you respond relating to

7  both of these questions.  But can you shed some light on what

8  in particular you want me to focus on with respect to those

9  exhibits.  Because those are the only exhibits that have been

10 admitted.  You understand that, right?                              11:32:26

11        MR. WILLIAMS:  I do understand that.

12        THE COURT:  All right.

13        MR. WILLIAMS:  And I'm sorry.

14        THE COURT:  And there's been references to other

15 discussions, but those are the days.  I don't know how many        11:32:31

16 hours of testimony that is or how many hours of tape that is.

17 But is there something in particular, do you want to focus --

18 is there something in particular that you challenge with

19 respect to those?

20        MR. WILLIAMS:  There is.  The reason why I suggest           11:32:48

21 that, Your Honor, is the difficulty we had in defending this

22 case in the way it was presented.  There were over 300

23 recordings.  The Government has chosen, I'm assuming, the

24 strongest evidence that they believe that they have out of

25 those 300 recordings.  And out of those hours of recordings,       11:33:07

1  and the CD itself would put that into context in that in the

2  four to five hours that Mr. Deng was reporting Mr. Simpson on

3  paper -- I'm sorry, on May 29th, for example, that in 2010,

4  that the Government played two or asked the Court to focus on

5  two statements.  One is a statement where he's singing and says    11:33:35

6  we have to go to Somalia, brother, and we have to make it to

7  the battlefield.  And there may be some other things.

8          But that conversation or those statements, one, are

9  separated by time, and, two, starts out with a conversation

10  about an apartment that Deng is living in and what they can do    11:33:54

11  about the carpet.  And that's primarily the majority of their

12  conversations are about mundane, day-to-day things that they

13  are involved with, that the religion that they are -- that he's

14  trying to teach.  And so there's really nothing to focus on.

15          I guess the focus is on -- the focus is what's not    11:34:15

16  there on the majority of the CDs.

17          So I can't tell you that there's something in there

18  that's going to tell you that they are not planning to go to

19  Somalia to engage in jihad, only that there are hours and hours

20  and hours of conversations that are not related to anything    11:34:35

21  related to any type of terrorist intention.  And so that's the

22  focus.

23          THE COURT:  And then my other question, is there

24  anything in particular in terms of the recordings that you saw,

25  the transcript that the Government prepared and presented as    11:34:51

1  part of its presentation in its case this chief?  Is there

2  anything in there -- it didn't really come out in any of the

3  questioning -- that you challenge with respect to those?

4         MR. WILLIAMS:  To the statements?

5         THE COURT:  The recordings.  The transcript that was          11:35:08

6  submitted by the Government.  You all made a statement at some

7  point before the evidence was presented.  The Government has

8  produced these transcripts.  You don't necessarily -- you're

9  not stipulating to the transcript, you're relying on the Court

10  to hear the conversation.  But I need to know or would like to          11:35:33

11  know from defense if there's any particular words or statements

12  that are reflected in the transcript that the Government

13  submitted that you challenge.

14         MR. WILLIAMS:  Not at this point.  We did not look at

15  it with the idea of challenging the transcript because of the          11:35:51

16  timing and when we got it.  We were preparing for -- preparing

17  for trail and did not sit down and try to review the tape

18  recording or the transcripts to see if they were accurate.  We

19  can only simply say that we cannot stipulate either way whether

20  or not they are accurate.  So --          11:36:16

21         THE COURT:  Well, but you haven't challenged anything

22  that they have submitted in the questioning so far of the

23  snippets, as you call them, that you've presented.  And I just

24  needed to ask if there's something in particular that you were

25  challenging with respect to that.          11:36:33

1           MR. WILLIAMS:  I don't believe so.

2           THE COURT:  All right.  Thank you.

3           MR. WILLIAMS:  And then finally, Your Honor, the

4    issue, at least in terms of the false statement, require that

5    the Government prove the elements.  We don't believe that          11:36:42

6    there's any indication or any testimony that supports that the

7    statements made by Mr. Simpson were a willful misstatement.  We

8    don't believe that the Government has presented any evidence to

9    establish that.  And so based on that as well, we believe that

10   the evidence is insufficient.                                      11:37:06

11          THE COURT:  Okay.  Thank you.

12          Mr. Morrissey?

13          MR. MORRISSEY:  Your Honor, the evidence is clear and

14   certainly more than sufficient for purposes of a Rule 29 motion

15   that when the FBI went to talk to Mr. Simpson on January 7th,      11:37:31

16   2010, that Mr. Simpson made a false statement with specific

17   intent to make a false statement.  That false statement was

18   whether or not Mr. Simpson had discussed with others traveling

19   to Somalia.

20          The Court will resolve any differences in testimony.       11:37:58

21   But there was no disagreement between Agent Hebert and Agent

22   Turner.  Both of them testified that Mr. Simpson was asked

23   several times about discussions about traveling to Somalia.

24   Both of them testified that Mr. Simpson was, in their mind, not

25   giving a direct answer to that question.  And in fact the          11:38:30

1  answer was that he answered that question with a question.

2  "Why would you ask me about this?  I don't know why anyone

3  would be saying that I had discussions of traveling to

4  Somalia."

5        In the absence of getting a direct answer to whether        11:38:43

6  or not he had had those discussions, both agents testified that

7  Agent Hebert then asked specifically in "yes" or "no" fashion:

8  Mr. Simpson, "yes" or "no," have you had discussions with

9  anyone about traveling to Somalia.  Mr. Simpson said no.  The

10  agents were entirely consistent in their testimony.        11:39:08

11        Giving the Government the benefit of all inferences

12  for a Rule 29 motion, that by itself is sufficient proof of the

13  false statement.  There's no question that that statement was

14  false.  Because as this Court heard from the testimony from

15  2007 on, Mr. Simpson's statements were about traveling        11:39:32

16  overseas.  And they became increasingly specific about

17  traveling in particular to Somalia.  And he did discuss it with

18  other people.

19        THE COURT:  I'm sorry, you said this Court heard from

20  the testimony.        11:39:51

21        MR. MORRISSEY:  Well, the Court did hear the testimony

22  of the witnesses in terms of Mr. Simpson's statements, the

23  Court heard the recordings.  And that is correct, not

24  testimony.  The Court heard the recordings and the exhibits as

25  to what Mr. Simpson said on those recordings.  Those were -- go        11:40:11

1    ahead.

2        THE COURT:  Speaking -- since you referred to

3    testimony, do you submit that the confidential informant,

4    Mr. Deng, testified as to the false statement or testified --

5    or what in Mr. Deng's testimony relate to the false statement    11:40:40

6    and to the involvement in the terrorism?

7        MR. MORRISSEY:  Mr. Deng testified as to what was said

8    on the recordings.  The agents are the ones who provided the

9    testimony that demonstrate that Mr. Simpson's statements on the

10   recordings were in fact what he said and proof that when he      11:40:58

11   denied that to the FBI agents, that that was a false statement.

12       The second --

13       THE COURT:  Was Mr. -- did Mr. Deng, was he able, just

14   on the false statement which relates to the travel to Somalia.

15       MR. MORRISSEY:  It does not, Your Honor.  The false       11:41:21

16   statement relates to whether or not Mr. Simpson had had

17   discussions with anyone of traveling to Somalia.  That's within

18   in the Indictment.  That's what's charged.

19       It's not just whether he traveled, it's whether he

20   discussed it with anyone.                                      11:41:37

21       THE COURT:  You are correct.  I said relates to travel

22   to Somalia.  You are correct on whether he had discussions with

23   anyone about traveling to Somalia.

24       Did the CI, did Mr. Deng testify to that short of

25   referring to the recordings?                                   11:41:54

1          MR. MORRISSEY:  My recollection --

2          THE COURT:  I'm just curious, you didn't ask him that,

3     short of referring to the recordings from my recollection.  But

4     I might be --

5          MR. MORRISSEY:  My recollection is that Mr. Deng          11:42:11

6     discussed that they had discussed fighting in jihad.  Mr. Deng,

7     I do not believe, offered opinions on what they had discussed

8     that were not based on the recordings.

9          THE COURT:  Not just opinions, I'm not asking if you

10    asked him about his opinion.  But you didn't ask him directly    11:42:32

11    that question, did you?

12         MR. MORRISSEY:  I asked him what was this discussion

13    about, what did Mr. Simpson just say.  Those were the types of

14    questions that I asked.

15         THE COURT:  Right.  But independent of the recordings.     11:42:49

16    There was no testimony from Mr. Deng that, yes, I recall

17    Mr. Simpson told me that he -- we had a discussion about

18    Somalia.

19         MR. MORRISSEY:  I guess not.  I don't really

20    understand the distinction the Court is drawing.  Mr. Deng       11:43:07

21    testified.  He testified as to what the conversations were,

22    what was said.  Apart from Mr. Deng's testimony, the recordings

23    themselves in evidence are proof of what Mr. Simpson said.  And

24    this Court is acting as finder of fact in this instance.

25         THE COURT:  I understand the recordings are in            11:43:28

1   evidence, and obviously the Court will consider them.  And I

2   have to do so in accordance with Rule 29 by deferring to the

3   prosecution in terms of if there's any question with respect to

4   what was submitted, I'll err on the side of the prosecution; is

5   that correct?                                                    11:43:55

6           MR. MORRISSEY:  Well, the standard of review is

7   preponderance of the evidence.  If the -- whether or not --

8   whether the Court, if it wanted to, could defer its ruling on

9   the Rule 29 motion.  But -- well, I'm sorry, it's not

10  preponderance, it's giving the Government the inferences,        11:44:14

11  credit for all inferences.

12          THE COURT:  Right.

13          MR. MORRISSEY:  I'm sorry.

14          THE COURT:  I understand that.  I just wanted to make

15  sure I was correct.  I'll look at the transcript as well,        11:44:25

16  though, to see whether or not I'm right on that with Mr. Deng

17  testified to with respect to the false statement part of the --

18  part of the charge.

19          MR. MORRISSEY:  And I believe the Court may find that

20  it was the Government's theory that the proof of the falsity     11:44:40

21  came from the FBI agents.

22          THE COURT:  Okay.  I had another question.

23          MR. MORRISSEY:  Sure.

24          THE COURT:  I noted in the trial memorandums that you

25  all submitted that you, on behalf of the Government, did not     11:44:56

1   list the element of the intent in the brief as it relates to

2   making the false statement.  The defense did.  So is it your

3   contention that there's no specific intent required here?

4          MR. MORRISSEY:  No, Your Honor.  I -- if I can look at

5   my trial memorandum.                                          11:45:21

6          I take the Court's point.  It is my contention that in

7   resolving this case, the Court should follow the Ninth Circuit

8   jury instruction on false statement which, and as I argued --

9   well, which says that the defendant must act willfully, that is

10  deliberately and with knowledge that the statement was untrue.  11:46:18

11         So that is certainly an element that the Court needs

12  to consider.

13         THE COURT:  Okay.

14         MR. MORRISSEY:  I would also note that the materiality

15  element, that the hard copy book of the 2003 jury instructions  11:46:37

16  is out of date, and that the current one is only on the Ninth

17  Circuit website that specifically there's a case that says --

18  it's Peterson that says that it's not plain error to use the

19  standard Ninth Circuit jury instruction, but that the better

20  practice is to instruct under willful -- under willfully         11:47:02

21  according to United States versus Gaudin, the Supreme Court

22  case, I'm sorry, on materiality.

23         So I would just note that that's the proper legal test

24  for materiality and that we should not use the Ninth Circuit

25  jury instruction that's in the book.                             11:47:25

1    In terms of whether or not the false statement

2 involved international terrorism, the statement must be one

3 that involves violent acts or acts dangerous to human life that

4 are a violation of the criminal laws of the United States.

5    Agent Hebert testified that an individual going to          11:47:55

6 fight overseas targeting a foreign government or a civilian

7 population is in violation of 18 U.S.C. 2339(a) or 2339(b),

8 depending on whether or not the group he's fighting with is a

9 designated foreign terrorist organization.

10    The activities have to be intended to coerce a          11:48:22

11 civilian population or influence the policy of a government.

12 Mr. Simpson, in his reference to it's time to go to -- to

13 Somalia, brother, on May 29th, 2009, also said:  We can make it

14 to the battlefield, it's time to roll.  There's, in that same

15 conversation, Mr. Simpson stated that the kaffur are fighting          11:48:47

16 against us because they don't want us to establish sharia.

17    It is clear that the discussion that Mr. Simpson is

18 having is about coercing a civilian population or targeting the

19 Government in Somalia which is installed by the United States

20 and the United Nations, and that it is not a Muslim government.          11:49:11

21 It is not a government that has sharia law.  And that is the

22 entire context of Mr. Simpson's statement about why the fight

23 must be in Somalia and what must occur there.

24    On June --

25    THE COURT:  Do you submit that there were no overt          11:49:33

1   acts made towards that end?  Do you agree with that?

2        MR. MORRISSEY:  No, because in the, I believe it's the

3   October 23rd conversation, Mr. Simpson tells Mr. Deng that he

4   and Yahya were talking about him going to South Africa and

5   then, I make my way to Somalia.  And they have the discussion    11:50:10

6   of how Mr. -- Mr. Simpson could be picked up in Somalia by the

7   brothers.  And it's very clear from context that it's for

8   jihad.

9        I think that Mr. Simpson's discussion with Mr. Sabari

10  is, in fact, an overt act and a discussion of planning.         11:50:34

11       I do agree that Mr. Simpson's travel plans, when he

12  intended to leave the country, were to go to South Africa

13  initially.  But it's very clear from the October 23rd

14  conversation that Mr. Simpson himself said that he was talking

15  about going to South Africa and then making his way up to       11:51:02

16  Somalia.  That statement, you can tell that Mr. Simpson himself

17  has looked at a map.  Because the defense exhibit, either 100

18  or 101, shows that the way to get to Somalia from South Africa

19  is to go north, to make your way up.

20       This Court can also credit the June 17th, 2009,            11:51:23

21  discussion where Mr. Simpson talks about having provided a

22  computer link about the permissibility of doing martyrdom

23  operations, and that he provided that to Yahya, who was John

24  Sabari.  So I think the trading of that type of information is

25  also possibly planning an overt act.                            11:51:51

1          I do not think it is the Government's obligation to

2     prove overt acts in furtherance of the violent activities.

3          THE COURT:  That was my next question.

4          MR. MORRISSEY:  Okay.

5          THE COURT:  So you don't think it's required?          11:52:09

6          MR. MORRISSEY:  I don't.  I think the Government must

7     meet the definition contained in Section 2331.  I think that

8     Mr. Simpson being investigated for by the FBI, and it's

9     undisputed that the FBI was investigating Mr. Simpson and his

10    associates for their potential plans to travel to Somalia to     11:52:31

11    fight on the battlefield against the Transitional Federal

12    Government.

13         I think those acts meet the definition within 2331.

14    They are violent acts that were going to coerce a civilian

15    population or a government that would occur primarily outside    11:52:51

16    the territorial jurisdiction of the United States.

17         On the subject of overt acts, I would also point out

18    that in interpreting what 18 U.S.C. Section 2331 means, this

19    Court should look to the legislative history provided by the

20    Government in its trial memorandum that states that the         11:53:10

21    enhancement or the additional element is intended to increase

22    the penalty from five years to eight years for obstruction of

23    justice in terror investigations.

24         That's exactly what Mr. Simpson did.

25         THE COURT:  And did Mr. Simpson need to know that          11:53:29

1  there was a terrorism investigation going on?

2          MR. MORRISSEY:  No.

3          THE COURT:  Because you -- do you agree he did not?

4  He was not told?

5          MR. MORRISSEY:  I do agree with that.                    11:53:44

6          THE COURT:  And so Mr. Williams argued that this was

7  simply free speech, that they were having discussions, that the

8  context revealed that these were just discussions because the

9  CI was -- well, I don't know if Mr. Williams said this, but it

10  came out the CI was interested in learning about Islam.          11:54:05

11          MR. MORRISSEY:  I'll stand on the Court's

12  determination of what's on the recordings.  It's very clear

13  that this was -- it's fine to talk about support for jihad.  It

14  is not fine to specifically discuss going to Somalia and then

15  lie about that to the FBI.                                       11:54:35

16          Mr. -- in terms of -- also on terms of willfulness,

17  Mr. Williams argues that the Government has not put in proof of

18  willfulness.  There is proof of willfulness.  This, by the

19  recordings themselves, this Court knows that this was the most

20  important matter in Mr. Simpson's life.  As he says in one of    11:54:55

21  the early recordings that dying for Allah is jannah.  It's

22  heaven.  Let's take that route.  And he talks about -- and

23  Mr. Deng asks:  Well, how can we do that?  Can we do that in

24  America?

25          And Mr. Simpson says, right now I'm talking about        11:55:13

1    going out.  And then he says, why not take that route?

2         So he's actively talking about being a martyr for

3    Allah.

4         When Mr. Simpson was interviewed by the FBI in 2007

5    and he said he did not want to talk about Abu Jihaad they          11:55:35

6    honored his request.  They didn't ask him any further questions

7    about that.  They went away.  In other words, Mr. Simpson knew

8    that he didn't have to talk to the FBI, and he knew in 2010

9    that he didn't have to talk to the FBI.

10         This Court also knows from the November 7th tape where      11:55:51

11   they talk about -- the group talks about what we would say if

12   we are stopped at the airport and how we would explain our

13   actions, that Mr. Simpson had a -- and he said that what he

14   would do is ask questions to the FBI or to law enforcement.

15   Five 0, were are you pulling me out?  Why are you asking me        11:56:12

16   these questions?

17         Just less than two months later, that's exactly what

18   Mr. Simpson did.  He behaved on January 7th, 2010, exactly in a

19   consistent fashion with how he told the group he was going to

20   behave on November 7th if they were confronted by authorities.     11:56:29

21         In other words, this Court can draw inferences from

22   the evidence that Mr. Simpson knew that he didn't have to talk

23   to the FBI, that he made a choice, and that, therefore, it was

24   a deliberate choice to talk to the FBI and to make a false

25   statement.                                                         11:56:55

1          THE COURT:  Okay, is there anything else?

2          MR. MORRISSEY:  No.

3          THE COURT:  Mr. Williams?

4          MR. WILLIAMS:  That is part of the problem that we had

5  in defending this case is that the Government has taken things          11:57:09

6  and taken them out of context and given them the definition

7  that they believe is the appropriate definition; for example,

8  Agent Hebert's definition of jihad being a holy war when that

9  was not the only definition.

10          Mr. Morrissey makes reference to terrorism being          11:57:29

11  applied because Mr. Simpson engaged in obstruction of justice.

12  This was not charged under obstruction of justice.  Obstruction

13  of justice and the enhancement requires an actual reliance by

14  the Government.  In this case, they knew what the answers were.

15  And so I don't believe that they -- the example of obstruction          11:57:47

16  is a good one.

17          In terms of Mr. Simpson saying that he was going to be

18  a martyr and the only way that he could get to jannah would be

19  by dying by -- on the battlefield, is simply another example

20  that Mr. Simpson was providing to Dabla Deng in terms of how          11:58:08

21  Islam worked and how someone could get to heaven, certainly not

22  the only way and certainly not any way that Mr. Simpson

23  indicated that he was willing to do it.  It is just merely

24  another indication where Mr. Simpson was providing an example

25  or instruction to Mr. Deng.          11:58:34

1           And in terms of whether or not he should know that

2       there was an investigation, I think goes directly to the issue

3       of willfulness and whether or not he was intentionally trying

4       to mislead the government at that time.

5           And without belaboring the issue, Your Honor, I           11:58:54

6       believe that the Government again has failed on their burden in

7       terms of the false statement and the element of whether or not

8       this involved terrorism.

9           THE COURT:  Thank you.  I'll take that under

10      advisement, the Rule 29 motion.                                11:59:13

11          We will resume after lunch.  Do you -- the Government

12      has rested.  How many witnesses do you have?

13          MR. WILLIAMS:  We are going to rest.

14          THE COURT:  All right.  And any exhibits that you are

15      going to try to introduce?                                     11:59:32

16          Why don't you look that over, let me know when we

17      resume from lunch.  And then I'll hear closing statements from

18      both sides.

19          We will return at 1:30.  I have a meeting over the

20      lunch hour.  And so we will return at 1:30.  Thank you very    11:59:49

21      much.  We will be in recess.

22          (The noon recess was taken.)

23          THE COURT:  Thank you.  You may be seated.  The record

24      should reflect the presence of the defendant, his counsel, and

25      counsel for the United States.                                 13:47:17

1    Mr. Williams, I believe right before we recessed for

2  lunch you had -- the Government rested and you indicated that

3  you would rest.  I asked you to see if there was anything

4  exhibit wise you wanted to review to see if there was anything

5  you wanted to move in.  Is there anything?                    13:47:39

6    MR. WILLIAMS:  No, Your Honor.

7    THE COURT:  All right.  And so do you rest at this

8  time?

9    MR. WILLIAMS:  We do.

10   THE COURT:  So that concludes the presentation of          13:47:49

11 evidence to the Court.  And so we are ready to proceed with

12 closing arguments.  Mr. Morrissey.

13   MR. MORRISSEY:  Mr. Simpson knew that he had a choice

14 when he spoke to the FBI in 2010.  He knew from experience in

15 2007 that if he chose not to speak to the FBI, that they would  13:48:15

16 not question him, that they would go away.

17   As Agent Hebert testified by executive order it is

18 within the United States' jurisdiction to deter and disrupt

19 American citizens traveling to foreign countries to engage in

20 violence that involves material support to terrorists or is --  13:48:41

21 or involves violent activities that is intended to, outside the

22 jurisdiction of the United States, coerce a civilian population

23 or a government through violence.  Those activities are

24 international terrorism.

25   Based on Mr. Simpson's statements on the recordings         13:49:03

1  that are in evidence, those -- that investigation by the FBI

2  into whether or not Mr. Simpson and his associates was going to

3  travel in particular to Somalia to engage in international

4  terrorism was well predicated and well taken.

5  The conversation of May 29th, 2009, that Mr. Simpson          13:49:33

6  had with Mr. Deng established beyond doubt that it was

7  Mr. Simpson who had expressed and discussed traveling to

8  Somalia.  That is in Exhibit 1.  We want to play a portion of

9  that.

10  As I do that, I would like to point out that we've          13:50:00

11  heard from the defense in the argument for the motion for

12  Rule 29 that statements of Mr. Simpson were taken out of

13  context and that they were just teaching.

14  Your Honor, you will not hear a single recording and

15  did not hear any evidence demonstrating that any of these        13:50:25

16  recordings was taken out of context and did not say what they

17  plainly said.

18  As an example, the conversation of May 29th, 2009,

19  does in fact begin with a discussion of sleeping and changing

20  out carpet in an apartment.  But it quickly turns, not through    13:50:46

21  any prompting of Mr. Deng, but by Mr. Simpson himself to

22  talking about going to Somalia.  That is what is on

23  Mr. Simpson's mind.

24  (A portion of Exhibit No. 1 was played.)

25  MR. MORRISSEY:  As Mr. Deng testified, what            13:51:44

1   Mr. Simpson said was:  Akee, it's time to go to Somalia,

2   brother.

3        Speaking of context, this is one unbroken

4   conversation.  And the conversation is about fighting to

5   establish sharia law.  And it's clearly about Somalia, as          13:52:00

6   Mr. Simpson discussed that the Ethiopians were over there

7   fighting.  Agent Hebert testified to the history of the

8   conflict in Somalia, that the Ethiopians had invaded in

9   approximately 2006 to support the Transitional Federal

10  Government that the Islamic militants, including Al Shabaab,        13:52:21

11  were fighting against.

12        I'm going to play just a minute or two of this

13  conversation to show in context it's absolutely clear that when

14  Mr. Simpson says it's time to go to Somalia, he's talking about

15  going to Somalia to the battlefield for the armed conflict.        13:52:38

16        (A portion of Exhibit No. 1 was played.)

17        MR. MORRISSEY:  A discussion of Ghana in this

18  recording, Your Honor, it's quite clear that Ghana is being

19  considered as a potential way station or point into Somalia.

20  As Mr. Simpson said earlier, you've got to have connected.  It     13:55:09

21  may not have been practical, it may not have been the best

22  plan, but it was Mr. Simpson's plan.  And it's utterly clear

23  that it was that plan to get to Somalia and to the battlefield.

24        (A portion of Exhibit No. 1 was played.)

25        MR. MORRISSEY:  Mr. Simpson told Mr. Deng:  We can           13:55:43

1  make it to the battlefield.  We gonna make it to the

2  battlefield.  It's time to roll.

3        It is absolutely clear why Mr. Simpson is discussing

4  travel to Somalia.

5        THE COURT:  I'm sorry, I'm going to go ahead and ask          13:56:00

6  questions since this is a trial to the bench.

7        You're saying the Court can infer just from these

8  recordings and the reference to Ghana that that was a plan?

9        MR. MORRISSEY:  One of the plans, yes.  That is the

10  Government's argument.                                              13:56:20

11        THE COURT:  Take me through that again.  Because, and

12  you -- are you saying anyone testified about that?

13        MR. MORRISSEY:  Judge, is that similar to your

14  question from this morning?

15        THE COURT:  Correct.                                         13:56:33

16        MR. MORRISSEY:  Okay.  About that plan and Ghana as a

17  way station, the recording is the evidence.  About the plans to

18  travel or the discussions about traveling to Somalia, the

19  recordings and Mr. Deng are the evidence.

20        Now --                                                       13:57:01

21        THE COURT:  I understand that.  I'm just -- so I'm --

22  I'm sorry, you are answering my question probably.  Go ahead.

23        MR. MORRISSEY:  Now, the -- I think one of the Court's

24  questions to me was -- was Ghana the plan for how to get to

25  Somalia.                                                           13:57:22

1        And the Government's argument is that it was one of

2   several methods that Mr. Simpson discussed as to how to get to

3   Somalia.  And this false statement in this case is whether he

4   had discussed traveling to Somalia.

5        For context, I would point out, and I'm not going to        13:57:41

6   go back and replay it, but just in this conversation itself,

7   Mr. Simpson talks about knowing plenty of brothers from

8   Somalia.  He knows them from the 32nd Street mosque.

9        Mr. Deng asked about connections.  And then it's

10  directly in response to connections, how would we do this, that   13:58:02

11  Mr. Simpson talks about I know other people in Ghana, too.

12       And so from context, it is very clear that Ghana is

13  one of the ways being considered as a way to get to Africa and

14  then to Somalia.  That's the recording.  Mr. Deng himself did

15  not speak to that.                                                13:58:24

16       THE COURT:  You place significance on Ghana.  Is

17  that -- I mean, there was no testimony about Ghana other than

18  this, what's here in the tapes.  For me to know that that's

19  somehow a gateway to Somalia and therefore a hot bed of

20  terrorism, I'm just trying to understand.                         13:58:40

21       MR. MORRISSEY:  I'm not -- oh, okay, Your Honor.  It

22  is not the Government's argument that Ghana is a hot bed of

23  terrorism.  It is the Government's argument that Mr. Simpson

24  spoke repeatedly about discussions about traveling through

25  Somalia, that this is one of those discussions.  This also        13:58:58

1  links to whether or not there was in fact a investigation into

2  his activities into whether or not that was an investigation of

3  international terrorism.  I'm only pointing out now from

4  context that making clear that it is not the Government who

5  took these conversations out of context, and that it is        13:59:20

6  Mr. Simpson discussing how to get to Somalia in this

7  conversation.

8          THE COURT:  Okay.  Thank you for clarifying that.  I

9  didn't know if you were saying that that supported the

10  involvement of terrorism.                                      13:59:35

11          MR. MORRISSEY:  No.

12          THE COURT:  Okay.

13          MR. MORRISSEY:  No.

14          THE COURT:  All right.  Proceed.

15          MR. MORRISSEY:  That's the May 29th conversation.      13:59:45

16  As -- another issue that arose is whether or not Mr. Simpson

17  used the word "jihad."  The Court can play Exhibit 1, the May

18  29th, '09 conversation and resolve that dispute for itself.  It

19  is in fact Mr. Simpson who speaks about jihad.  He also speaks

20  about fighting.                                                14:00:15

21          The Indictment --

22          THE COURT:  Does he specifically say "jihad"?

23          MR. MORRISSEY:  He does.

24          THE COURT:  Okay.  All right.

25          MR. MORRISSEY:  He says jihad several times in several  14:00:22

1  contexts.  I would point out that the Court can go through each

2  of the five exhibits, and the Court will never find an instance

3  in which Mr. Simpson talks about jihad or fighting as a

4  personal, peaceful inner struggle to correct some flaws within

5  himself.  Mr. Simpson's references to jihad and to fighting are    14:00:44

6  always in the context of imposing sharia law.  It is also in a

7  violent context.

8          Now, what steps did Mr. Simpson take to put any such

9  plan into effect?  We spoke this morning during the Rule 29

10  colloquy about, well, does he have a First Amendment right to    14:01:10

11  talk about jihad.  And does he have a First Amendment right to

12  discuss going to the battlefield to impose sharia law?

13          The answer is Mr. Simpson, of course, can speak about

14  jihad.  And he can talk about his views that sharia law should

15  be the governing law in Somalia or in America for that matter.    14:01:38

16  But where he makes those statements about traveling to Somalia

17  and he has a plane ticket to South Africa, and a plan to go to

18  Somalia from there, and then when he is asked about the FBI --

19  by the FBI whether or not he had ever discussed that, and he

20  chooses to deny that he had, he has made a false statement that    14:02:06

21  is material within the jurisdiction of the FBI.

22          He does not have a First Amendment right to make a

23  false statement to the FBI in this context.  There's no

24  question that he -- that there was a false statement.  As I

25  just played, he had discussed traveling to Somalia in his    14:02:31

1    discussion with Mr. Deng on May 29th, 2009.  But the proof that

2    he knowingly made that false statement is not predicated on a

3    single brief conversation.

4         Mr. Simpson himself, again in a conversation with

5    Mr. Deng, tells Mr. Deng who else he had talked about going to          14:02:56

6    Somalia with.  And I'm going to play that now.  That's from the

7    October 23rd conversation which is Exhibit 4 in this trial.

8         (A portion of Exhibit No. 4 was played.)

9         MR. MORRISSEY:  Mr. Deng testified that he said right

10   there to Simpson that he was going to be bouncing soon and that       14:04:52

11   bouncing meant leaving, leaving the United States.  And this is

12   Mr. Simpson's reply.  And for context --

13        THE COURT:  You said this Exhibit 4, what date does

14   this relate to?

15        MR. MORRISSEY:  October 23rd, 2009.  And Mr. Simpson's          14:05:05

16   reply makes it very clear in context what leaving the

17   United States means to him and means to Mr. Deng, who's playing

18   his role as a person for the FBI learning from Mr. Simpson and

19   interested in fighting overseas.  Mr. Simpson is about to talk

20   directly about going on missions all over the world.                  14:05:29

21        (A portion of Exhibit No. 4 was played.)

22        MR. MORRISSEY:  Mr. Simpson not only talked to

23   Mr. Deng about going to Somalia, by his own words, he talked to

24   Yahya, John Sabari, about going to South Africa.  And it's

25   beyond dispute, he had a visa, and he was going to go, and a          14:06:04

1  plane ticket to go to South Africa.  But by his own words, he

2  was then going to make his way up to Somalia, or at least this

3  is what he is discussing.

4          (A portion of Exhibit No. 4 was played.)

5          MR. MORRISSEY:  Regardless of what Mr. Simpson's          14:07:11

6  actual result would have been if he had gotten to South Africa,

7  it is a fact that on May 29th of 2009 and October 23rd, 2009,

8  by his own words, he discussed traveling with -- traveling and

9  had discussions about traveling to Somalia.

10         This Court heard testimony and heard recordings that      14:07:39

11  Mr. Simpson was planning on going to school.  But there is

12  evidence that placed considerable doubt on whether or not that

13  was actually his plan and, of course, shows why this was a

14  well-founded investigation into whether or not he was going to

15  commit international terrorism.                                 14:08:06

16         On November 7th, 2009, which is Exhibit 5, in another

17  discussion with Mr. Deng and in the presence of Mr. Yong, there

18  is a discussion of traveling and a discussion of the mujahideen

19  and fighting.  And Mr. Simpson's words are school is just a

20  front.  School is a front.  He says it twice.                  14:08:37

21         This man is not serious about remaining in school in

22  South Africa.  What is he serious about?  And if I am given an

23  opportunity to bounce, and we know from testimony of Mr. Deng,

24  as well as the recordings themselves, that bounce means to

25  leave.                                                         14:09:03

1          It is at that point -- well, for one thing, in that

2     same conversation, Mr. Yong says:  You know me, I'm just trying

3     to roll.  In other words, just like Mr. Simpson had stated,

4     Mr. Yong is trying to roll to the battlefield, which is another

5     reason why the FBI's investigation into whether or not          14:09:22

6     Mr. Simpson and his associates were going to travel to Somalia

7     was well founded as a terrorism investigation.

8          Mr. Simpson talks about if confronted by the FBI, what

9     he would say and he would question the FBI or police.  He would

10    question them in saying:  Why you asking me these questions.    14:09:50

11    Which is exactly what he did when he spoke to the FBI on

12    January 7th, 2010.

13         The Court asked this morning about overt acts.  His

14    whole travel plan is an overt act.  I don't have to prove that,

15    Your Honor.  He's not charged with material support of          14:10:13

16    terrorism.  And I don't have to prove a single overt act.  But

17    the fact is, his whole travel plan is an overt act.  Get to

18    South Africa and from South Africa get to Somalia.  That's what

19    he says on October 23rd, 2009, and it's a fair inference from

20    what he said on November 7, 2009.                               14:10:36

21         Those are the statements of May 29 and October 23rd,

22    2009.  Those exhibits and more importantly, Mr. Simpson's words

23    are in evidence.  The recordings themselves are in evidence.

24    And Mr. Deng's testimony authenticates these recordings.

25    Mr. Deng told us that it is Mr. Simpson speaking on those       14:11:02

1  tapes.

2       Agent Hebert testified that he had listened to the

3  tapes and it is Mr. Simpson's voice on those tapes.

4       Mr. Simpson's own words are proof of what he had

5  discussed.  When he told the FBI that he had not discussed          14:11:21

6  traveling to Somalia, he made a false statement.  He made a

7  false statement willfully because on May 29th, 2009, he had in

8  fact discussed traveling to Somalia.  Because on October 23rd,

9  2009, he had in fact discussed travel traveling to Somalia.

10 And on November 7, he had discussed bouncing from school.          14:11:48

11      The evidence is beyond doubt that he deliberately and

12 with knowledge that his statement was untrue chose to lie to

13 the FBI when they, as part of their legitimate investigation,

14 asked him whether or not he had ever had discussions about

15 traveling to Somalia.                                              14:12:14

16      That statement was material to the FBI.  It not only

17 was capable of influencing their activities, it in fact did.

18 Because the FBI at that point had to take steps to try to

19 prevent Mr. Simpson from leaving the United States.  They were

20 unsuccessful, but the FBI attempted to place Mr. Simpson on the    14:12:40

21 no-fly zone -- no-fly list.

22      The FBI also took steps with further interviews and

23 discussed whether or not they would have to notify the

24 Government of South Africa about Mr. Simpson if Mr. Simpson was

25 successful in leaving the country.                                 14:12:59

1      Getting away from all of the elements, the objections,

2  a question is:  Was this all talk?

3      Well, we'll never know what would have happened if

4  Mr. Simpson had gotten to South Africa.  We'll never know if he

5  would have followed through on his statements about getting to          14:13:26

6  the battlefield in Somalia and his twice-stated intention to

7  get to Somalia.  But the FBI certainly had a valid

8  investigation into that and jurisdiction to ask about that.

9  And when Mr. Simpson lied about that statement, that statement

10  was a false statement and it was a false statement involving          14:13:52

11  international terrorism.

12          THE COURT:  Mr. Morrissey?

13          MR. MORRISSEY:  Yes.

14          THE COURT:  So it's possible that someone -- that

15  someone who you submit not only was under investigation for          14:14:13

16  terrorism and --

17          MR. MORRISSEY:  Your Honor, could I just say one

18  clarification?  Because terrorism to me is a little too broad.

19  He was under investigation for activities that related to

20  international terrorism, according to the Government's argument          14:14:44

21  and proof.  And I would -- if I am correct, that this Court

22  should find Mr. Simpson guilty not only of false statement, but

23  false statement involving international terrorism, it would be

24  with reference to that definition.

25          THE COURT:  Okay.  I appreciate that.  And I'll accept          14:15:05

1   that.  But is it possible that someone could be involved in --

2   investigated for and in your submitting, guilty of activities

3   related to international terrorism and making a false statement

4   that would involve international terrorism and not get on the

5   no-fly list?                                                    14:15:30

6           MR. MORRISSEY:  Yes.  And here's --

7           THE COURT:  So you can explain that, but I just find

8   that interesting that you could, in essence, be guilty in your

9   estimation of this but be allowed to fly.

10          MR. MORRISSEY:  Absolutely.  And here's what I'm        14:15:50

11  struggling with and I'm going to put this very carefully.

12  Agent Turner was asked what the criteria was to get placed on

13  the no-fly list.  And what I can't remember, there was an

14  objection.  And I can't remember whether or not Agent Turner

15  was allowed to answer.  Because I would like to answer based on 14:16:14

16  what the testimony is.  Because there's a very common sense

17  answer as to why, yes, you can be involved with international

18  terrorism and not be on the no-fly zone.

19          Since this is a bench trial, may I make a suggestion?

20          THE COURT:  Yes.                                        14:16:33

21          MR. MORRISSEY:  Agent Turner answered that the

22  criterion is no-fly list only goes to whether you are a threat

23  to aviation itself.  If the Court sustained that objection,

24  then that's not in evidence.  If the Court did not, and I

25  cannot recall, then -- then in response to the Court's          14:16:59

1  question, here's the answer.

2      Unless you can show the airlines that this individual

3  is going to blow up that airplane directly or cause something

4  very bad to that airplane, you don't get on the no-fly list.

5      So it is not an effective tool or filter to prevent          14:17:16

6  individuals from going overseas if they have an intent to

7  engage in international terrorism.  That is also why the FBI

8  spoke about if he succeeded, if Mr. Simpson succeeded in

9  getting to South Africa, they would have had to take other

10  steps with respect to the government of South Africa.  So there   14:17:39

11  is not that correspondence between the no-fly list and

12  international terrorism.

13      THE COURT:  And then I just want to make sure before

14  you sit down in your closing statement here, you have charged

15  false statement and you -- it's been referred to as an          14:17:59

16  enhancement because of the terrorism activity was involved.

17      MR. MORRISSEY:  I think that that is not correct.  Why

18  the phrase "enhancement" comes up, Your Honor, is because under

19  the Sentencing Guidelines, 3A1.4 and I believe 2J1.2, there is

20  a sentencing enhancement for essentially obstruction involving   14:18:22

21  international terrorism.  The reason I am not asking the Court

22  to rely on those, is the definition of terrorism in 3A1.4

23  actually goes to a different statute.  It goes to 2332.  And so

24  the Court has asked do I think it is an enhancement?  No.  I

25  think that regular false statement is a lesser included of      14:18:53

1    false statement involving international terrorism, and that

2    this Court would have to make a determination not only whether

3    Mr. Simpson was guilty of a false statement, and if he was,

4    whether or not that false statement involved international

5    terrorism.                                                    14:19:15

6         THE COURT:  You say "I think."  Do you know?  I mean,

7    I want to know if that's in dispute.

8         MR. MORRISSEY:  I don't believe it's in dispute.

9    Defense counsel and I have discussed this very issue.  Let

10   me -- let me put it in a way that I think is very direct.  Is   14:19:29

11   involving international terrorism an element of the offense?

12   Yes.  If this Court found that the statement was false and met

13   all of the other elements, materiality, jurisdiction, but was

14   not involving international terrorism, the Government submits

15   that you would find Mr. Simpson guilty of false statement, just 14:19:55

16   not false statement involving international terrorism.

17        THE COURT:  And it goes to the proof.  If it's an

18   element of the offense, then I assume it's something that the

19   jury would have decided if this had been a jury trial.

20        MR. MORRISSEY:  Yes.                                     14:20:12

21        THE COURT:  And it's proof beyond a reasonable doubt

22   as opposed to --

23        MR. MORRISSEY:  As any other element.

24        THE COURT:  An enhancement, sentencing enhancement.

25        MR. MORRISSEY:  Which --                                 14:20:20

1          THE COURT:  Which is treated differently.

2          MR. MORRISSEY:  Which has different standards.

3          THE COURT:  And I just want to be very clear about

4     that.

5          MR. MORRISSEY:  Yes.  And I think the best source --          14:20:26

6     well, the statute in that sense speaks for itself in terms of

7     laying it out as an element.  I would also, though, as this

8     Court looks to what satisfies a false statement involving

9     international terrorism, the Court would look at not only the

10    definition of international terrorism, but also at the          14:20:57

11    legislative history which tells this Court that if Mr. Simpson

12    by his lies is obstructing an investigation into international

13    terrorism, then that is in fact the offense of false statement

14    involving international terrorism.

15         This Court would have to find that the activities that    14:21:20

16    Mr. Simpson spoke about meet the definition under 2331.  The

17    Court would not have to find that the Government had shown

18    sufficient proof of how exactly he intended to get to Somalia,

19    what his mode of entry into the country was, and that by lying,

20    he had obstructed that investigation.          14:21:44

21         THE COURT:  All right.  And you've spoken about

22    involving international terrorism.  I just -- the definition

23    that you have provided, which is in the statute, 18 U.S.C.

24    Section 2331(1), indicates that international terrorism

25    involving international terrorism means activities that involve    14:22:07

1  violent acts or acts dangerous to human life, that are a

2  violation of the criminal laws of the United States or of any

3  state, or that would be a criminal violation if committed

4  within the jurisdiction of the United States or of any state.

5          MR. MORRISSEY:  Yes.                                    14:22:29

6          THE COURT:  All right.  And then appear to be intended

7  to intimidate, coerce a civilian population, to influence a

8  policy of a government by intimidation or coercion or to affect

9  the conduct by a government by mass destruction, assassination

10 or kidnapping.  And then the third part of that definition is   14:22:48

11 occur primarily outside the territorial jurisdiction of the

12 United States or transcend national boundaries in terms of the

13 means by which they are accomplished.  It goes on.

14         So breaking down that, apply the facts that you submit

15 have been presented to the Court in fulfilling the definition   14:23:18

16 of involving international terrorism.

17         The reason I ask this, you all submitted -- the other

18 reason I'm asking you to do this, you all submitted some

19 memorandums very -- both of them were very thin from each side

20 on this particular aspect.  I don't know if there's just not    14:23:37

21 anything out there.  I don't think there was anything from the

22 Ninth Circuit.  But I don't know if you all looked beyond the

23 Ninth Circuit.  I can't help but think there would be case

24 examples or case law that shed light on this involving

25 international terrorism, maybe the Second Circuit, the D.C.      14:23:51

1    Circuit, or elsewhere.

2         MR. MORRISSEY:  No, Your Honor, I will, of course, be

3    embarrassed if your law clerk finds it.  But I don't think

4    there is.  And in consultation with the counterterrorism

5    section of main justice, it is their view that this case is a          14:24:06

6    case of first impression, that there is not case law on

7    international terrorism within the definition of 2331.

8         Again, there is case law under 3A1.4, but that is a

9    different definition.  And I just highlight that for this

10   Court, because I think the Court's going to start and stay with       14:24:28

11   the statute and its words and its meaning and its legislative

12   history.  And the answer to that is, I believe this is a case

13   of first impression.

14        THE COURT:  All right.  Then take me through this

15   definition before you sit down.                                        14:24:41

16        MR. MORRISSEY:  Sure.  How the Government believes

17   that Mr. Simpson's activities meet the definition are:

18   Mr. Simpson had plans that involved violent acts that are a

19   violation of the criminal laws of the United States.  That is,

20   crediting Mr. Simpson's statements that he intended to go to          14:25:07

21   Somalia to the battlefield to impose sharia on the Transitional

22   Federal Government and the population of Somalia, that is a

23   violent act in violation of 18 U.S.C. 2339(a) and 2339(b).

24        THE COURT:  Because going to the battlefield and

25   impose sharia according to the evidence means what?  I mean, we       14:25:36

1   have to break it down, Mr. Morrissey, so please do so.

2          MR. MORRISSEY:  Judge, I appreciate the opportunity --

3          THE COURT:  Okay.

4          MR. MORRISSEY:  -- for -- for the Court to ask me to

5   pinpoint where I think it meets it.                          14:25:48

6          THE COURT:  Especially if you are submitting this as a

7   case of first impression.

8          MR. MORRISSEY:  I do think it is.

9          THE COURT:  All right.  Go ahead.

10         MR. MORRISSEY:  I'm going to try to give the best      14:25:55

11  answer, but, Judge, essentially it's the concept of material

12  support.  If Mr. Simpson is talking about going to Somalia to

13  fight against the government there because it is not a

14  government that has sharia law, then he is talking about

15  material support to terrorism and targeting the Transitional  14:26:15

16  Federal Government.  It is his statements that show that he was

17  discussing violent acts that would influence the government of

18  Somalia, the TFG, and the civilian population.

19         And as background of that, Agent Hebert testified to

20  the situation in Somalia in 2000 -- I believe he went from 2004  14:26:35

21  to the present.

22         Mr. Simpson's statements are activities that involve

23  violent acts.  By definition those acts of changing the

24  Government and changing the law are intended to influence the

25  policy of the Government by intimidation or coercion.  That's  14:26:59

1  why he spoke of a battlefield.

2  THE COURT:  So changing the Government or changing the

3  law would -- would qualify as intending to influence the policy

4  of another government; is that correct?

5  MR. MORRISSEY:  Yes.  And, Judge, that's close to the          14:27:17

6  Government's argument.  But I don't just mean changing a law,

7  changing a single law.  The discussion was imposing sharia law,

8  that type, which is an all encompassing life according to

9  strict radical Islam.

10  THE COURT:  And so you're saying that the statement on         14:27:36

11  tape of Mr. Simpson saying that he wanted to go to Somalia --

12  hold on a second -- to impose sharia law; is that --

13  MR. MORRISSEY:  Yes.

14  THE COURT:  Therefore, means -- because I have to

15  connect the agent's testimony at that point -- that that means  14:28:01

16  changing the government and changing the law?

17  MR. MORRISSEY:  Yes.  But not really.  You won't have

18  to go too far to connect the testimony, because I believe the

19  Court would then at that part of its inquiry focus pretty

20  carefully on the May 29th, 2009 recording in which Mr. Simpson  14:28:17

21  says:  If they fighting against us, it's because they don't

22  want us to establish sharia.

23  Mr. Deng says:  No.

24  Simpson's next statement is:  They only fight you when

25  you about to do something, about to make something up, a threat  14:28:35

1    to them.  How many times America went over there, or the

2    Ethiopians, that's who they are fighting against.

3            This is in the discussion of we can make it to the

4    battlefield, it's time to go to Somalia.  That is the

5    connection.                                                    14:28:53

6            THE COURT:  And so the statements separate and aside

7    from the statement that he made regarding going to Somalia and

8    making sure they imposed sharia, you're saying in combination

9    with this statement that you're just saying that if -- if

10   fighting against us.  And what does "against us" mean?          14:29:17

11   According to --

12           MR. MORRISSEY:  Well, it's pretty clear from context

13   that what Mr. Simpson is saying is us are those Muslims who

14   believe in fighting overseas.

15           As he said in the earlier conversation, those brothers  14:29:36

16   who don't want to fight in Somalia, in Palestine and Iraq have

17   a disease in the heart.

18           THE COURT:  And you say that like it is crystal clear.

19   And I know you've studied these transcripts probably, based on

20   how you're arguing that.  But when you say looking at it in     14:29:55

21   context, especially the way it came out, maybe because it's

22   also hard to hear, you're saying in fighting against us, can be

23   easily figured out to mean what you said based on what?

24           MR. MORRISSEY:  Well, based on what's -- what was just

25   preceding it.  If the kuffar, which the testimony was kuffar    14:30:19

1    means nonbelievers, if the kuffar's not fighting against us

2    that means we establishing the sharia.  That very paragraph and

3    the next paragraph refers directly to fighting, talks about the

4    fighting involving the Ethiopians.  It's within about 10, 15

5    lines that Mr. Simpson says, "I'm telling you, man, we are     14:30:46

6    going to make it to the battlefield."  That's the conversation

7    about Somalia.

8         So I don't think the Government is asking this Court

9    to make extraordinary inferential links.  And I do keep saying

10    context, because the accusation has been that the Government     14:31:03

11    somehow twisted the context from these statements.  And I'm

12    very confident that the Court will find that the context is as

13    laid out.

14         THE COURT:  Anything else to support the involving

15    terrorism that you can point the Court to?     14:31:26

16         MR. MORRISSEY:  I don't think I -- I don't think I

17    spent much time on prong C, which would be that the activities

18    would occur primarily outside the territorial jurisdiction of

19    the United States or transcend natural -- national boundaries.

20    The Government's argument is these discussions of conducting     14:31:46

21    these activities in Somalia does occur primarily outside the

22    territorial jurisdiction of the United States.

23         THE COURT:  And do you have anything else on -- to

24    influence the policy of a government by intimidation or

25    coercion?  Is there anything else in the record that you would     14:32:03

1   point to to support that prong, that -- the definition of

2   involving international terrorism?

3       MR. MORRISSEY:  I think the Court wants specifics in

4   response to that.  And so if I could have just a moment to

5   marshal my -- my best second recording, if the Court is not          14:32:32

6   completely convinced by the May 29th, 2009, recording.

7       THE COURT:  Well, I'm not telling you one way or the

8   other.

9       MR. MORRISSEY:  I know you're not.

10      THE COURT:  You're very conversant in a lot of these          14:32:46

11  terms --

12      MR. MORRISSEY:  Can I rephrase something?

13      THE COURT:  Let me just finish and then you can

14  rephrase it.  And I'm not sure that you fully appreciate people

15  hearing it for the first time and trying to connect it to the          14:32:57

16  definition that either your FBI agent gave or your CI gave is

17  as easily decipherable as you may perhaps understand it.  I'm

18  not saying it might not be.  That might not be the case, I

19  just -- you say that with such confidence that I don't think

20  you fully appreciate that those are rather specialized and          14:33:23

21  unique terms that most are not that familiar with.

22      MR. MORRISSEY:  And I did not take any of the Court's

23  comments as being that the Court was either indicating lack of

24  being convinced on one point or the other.  I took the Court --

25  what I was trying to say was, I believe that the May 29th,          14:33:44

1   2009, conversation is itself sufficient proof.  If the Court

2   would then look to other sources, which is what I think the

3   Court was asking me is where else would I look.

4           THE COURT:  That have been submitted in the record.

5           MR. MORRISSEY:  Absolutely.                              14:34:01

6           Then I would ask the Court also to look very carefully

7   at the October 23rd conversation, because that conversation,

8   it's very clear from context, that when Mr. Simpson talks about

9   going to South Africa and then making his way to Somalia, and

10  then being picked up in Somalia, it's very clear that he's       14:34:22

11  talking about, for purposes of fighting.  That's why he says

12  just prior to that:  Going on missions.

13          And Mr. Deng and Mr. Simpson talk about, well, if your

14  intention is clear, then it's okay that that's far away, that

15  that's a lot of traveling.  And from context, it's clear that    14:34:40

16  that intention is to fight overseas.

17          Then in somewhat descending order, the November 7th,

18  2009 conversation in which Mr. Simpson states that school is a

19  front, and that if he is given an opportunity to bounce, that

20  is supporting evidence.  He does not finish that thought on the  14:35:05

21  November 7th, 2009 conversation, which is why I offer that

22  third.

23          THE COURT:  All right.  Thank you very much,

24  Mr. Morrissey.

25          MS. SITTON:  Your Honor, at the beginning of this        14:35:47

1  case, I asked and I told you that we were going to have to

2  figure out what this case is really about.  And the agent told

3  us what this case is really about.  He told us about the two

4  people at Mr. Simpson's mosque who were caught supporting

5  and --                                                            14:36:06

6          THE COURT:  When you say "the agent," can you tell me

7  which agent?

8          MS. SITTON:  I believe it was Agent Hebert.

9          THE COURT:  Okay.

10         MS. SITTON:  Who talked about how Abu Jihaad and the     14:36:12

11 other gentlemen were charged that went to Mr. Simpson's mosque

12 that were charged with terrorist acts and convicted, that

13 that's how they started looking at Mr. Simpson.

14         And then it became about -- and it's now come about

15 this confidential informant, Dabla Deng, pretty terrible        14:36:32

16 informant.  He doesn't understand half of what somebody asks

17 him.  He clearly doesn't understand some of Mr. Morrissey's

18 questions.  He stated, I believe, in answer to one of the

19 questions that we were in the country of Somalia right now.

20 And then another time he answered that we were in Arizona.      14:37:01

21         And the FBI is using Mr. Deng and his summaries of the

22 conversations with Mr. Simpson to establish the charges in this

23 case and to establish their investigation.

24         An informant, who they were paying and they were

25 paying based on how well they thought he was doing.  That's     14:37:24

1   what Hebert testified to.  He testified that based on whether

2   he was doing well or not, that was how much -- that was what he

3   was getting paid based on.  And he was getting paid a lot of

4   money.  $46,000 without having money taken out in one year?

5   $32,000 one year without having any money taken out.  That's a         14:37:49

6   significant amount of money.  And the more information he gave,

7   the more money he got.

8            We really have to look at the elements of the offense.

9   The first element that is required is a false statement.  And

10  it's undisputed that the false statement that we are looking at        14:38:15

11  here is the answer "no."  So what is the question?  And we've

12  gone over this, Mr. Williams went over it in the Rule 29.  What

13  is the question?  The agents can't seem to agree what the

14  question is.

15           Agent Hebert testified at the grand jury that it was          14:38:37

16  once, one question.  And then he tried to fix it here on the

17  stand yesterday.  And Agent Turner came in, and he had a

18  completely different question.  So if the statement is "no,"

19  doesn't it make it very important what the question is?

20           We would know what the question is if they had               14:39:01

21  recorded the conversation, recorded the conversation like they

22  recorded 330 body wires between Mr. Deng and Mr. Simpson.  But

23  we don't have those.  We don't have a recording.  We just have

24  what the agents said, and they can't even agree on what they

25  asked.                                                                 14:39:30

1    And so was the answer false?  And that's the question.

2    We have snippets of six conversations.  And the

3  Government states that Mr. Simpson repeatedly spoke about

4  Somalia, repeatedly.  Twice?  May 29th, 2009, he talks about

5  Somalia.  November 7, 2009, he talks about Somalia.  That's it.   14:39:58

6  So out of 330 conversations, thousands of hours, six snippets,

7  only in two of them does Mr. Simpson say anything about

8  Somalia.

9    Was it knowing?  Was the statement knowing, or was it

10  willful?  Agent Hebert testified repeatedly, and he did testify   14:40:36

11  repeatedly, that he misspoke.  He misspoke at the grand jury

12  transcript -- at the grand jury hearing.  He misspoke at the

13  detention hearing.  Why is this any different?  Why is he

14  allowed to misspeak when he's under oath and Mr. Simpson -- we

15  have to infer that Mr. Simpson is lying and not misspeaking     14:41:01

16  when he made his statement on January 7th.  Why is that?

17    Agent Turner testified, Mr. Morrissey asked him

18  whether or not Mr. Simpson had called back after the

19  conversation and told him what the name of the school was in

20  Somalia -- or in South Africa that he was going to go to.     14:41:24

21  Agent Turner's first answer was no.  And then when

22  Mr. Morrissey reminded him, gave him a memory prompt, he

23  remembered.

24    It was nine months ago.  How could he remember?  Why

25  is that any different than Mr. Simpson?     14:41:50

1      Did Mr. Simpson have a memory prompt like Agent Hebert

2   had like he testified to?  He wrote notes about his

3   conversation.  He wrote notes to make a memory prompt, because

4   even he testified, that ten months later, he doesn't remember

5   exactly what was said.  He wrote notes as a memory prompt and          14:42:08

6   then he created another memory prompt, a 302, to remind him

7   about what was said.

8      Mr. Simpson wasn't given a memory prompt.  Mr. Simpson

9   was accosted at his door.  They come to his door and they don't

10  tell him the nature and purpose of the interview.  Agent Hebert        14:42:32

11  admitted that.  Agent Turner admitted that.  They didn't tell

12  him why they were there.  They just started firing questions at

13  him.  They don't tell him why they were there like they did the

14  day before when they went to Mr. Sabari's house.  They just

15  started firing questions at him.                                       14:42:49

16     No memory prompt, no notes, no 302.  They just started

17  asking him questions.  So was it a knowing and willful false

18  statement when they are asking him about a statement that he

19  might have made in May, eight months prior?

20     They tried to give Mr. Simpson an opportunity to go to           14:43:14

21  Somalia and wage jihad and he said no.  They offered him --

22  they put forth an elaborate ruse, $10,000, Mr. Deng won $10,000

23  in a lottery.  He said:  We can't take that money.

24     It doesn't make sense.  The international terrorism

25  element is not fair.  The Government wants to argue that all it        14:43:49

1    has to prove is an investigation.  Let's look at the

2    Indictment.  The Indictment states that on or about January

3    7th, 2010, in the District of Arizona, defendant Elton Simpson

4    did knowingly and willfully make a material false statement and

5    representation in a matter within the jurisdiction of the          14:44:11

6    executive branch of the government, to wit, the FBI, which

7    statement involved international and domestic terrorism.

8    That's what the Indictment says.  That's what they went to the

9    grand jury on.  And that's what he's charged with.

10           If they thought just an investigation was enough, then    14:44:30

11   why didn't they charge it that way?  These are the elements the

12   Government has to prove.  And they don't have it.

13           The agent wants to testify that jihad necessarily

14   means holy war.  But it doesn't.  He admitted it himself.  It

15   doesn't just mean holy war.                                        14:44:51

16           There is violence in every religion.  There's violence

17   when you talk about the history of religion.  Mr. Deng

18   testified about the crucifixion after I asked him about

19   crucifixion of Jesus.  We can all think of violence within the

20   Bible, within every single religion.                               14:45:12

21           Just because someone is exercising their First

22   Amendment right to speak and to speak about their chosen

23   religion, does not mean that they are discussing international

24   terrorism.

25           If Mr. Simpson is guilty of making a statement             14:45:28

1    involving international terrorism, then every preacher on this
2    earth who testifies about the crucifixion on Easter is talking
3    about international or domestic terrorism.  It's absolutely
4    ridiculous.
5          Just talking about Somalia is not enough.  Mr. Simpson    14:45:54
6    talks a lot.  He talks a lot about a lot of things.  He watches
7    a video with Mr. Deng about ants.  They watched DVDs.  They go
8    to Kabob Palace.  They do a lot of things.  This is all about
9    these little snippets of conversation.
10         The Government brings in a snippet from July 31st,         14:46:35
11   2007, two years prior to the date listed in the Indictment.
12   This says that May 29th or thereafter, he spoke about -- made a
13   false statement.  And he spoke about Somalia.  And yet they
14   want to bring in this snippet from July 31st, 2007.  And in
15   that conversation Mr. Simpson is talking about Iraq, Palestine,  14:46:57
16   Somalia.  And in that statement, he says the first place he has
17   to go is Palestine.  Is he -- any evidence that he's going to
18   Palestine?  No.
19         And then Dabla Deng testified, well, what does that
20   mean, he was going to Iraq or Somalia or Palestine for what      14:47:21
21   reason?  Oh, to do jihad.  It's not in the tape.  It's not in
22   the snippet.  But that's what's -- that's what they are --
23   that's what they are assuming that that's what it's about.
24         It's not in there.  The Government wants you, and they
25   keep saying it's obvious, it's obvious.  It's not obvious.       14:47:42

1          May 29th, Mr. Simpson says, 32nd Street.  We know lots

2    of Somalians.  Could Mr. Deng name one?  No.  Did they bring in

3    anybody to say that this is a mosque that's full of Somalians?

4    No.  Why?  Who knows.

5          He also said that Mr. Simpson said that Mr. Deng could    14:48:06

6    pay off a car.  Did they do that?  No.  Did he sell the car so

7    that they could travel?  No.

8          Any plans to go to Sudan with Mr. Deng?  No.

9          In that tape they also talk about a video that seems

10   to be about a guy getting beheaded.  Is watching a video mean    14:48:32

11   that someone is going to do violence?  Does watching horror

12   movies mean that somebody is going to do violence?  Does

13   watching a movie about war mean that somebody is going to go do

14   something about war?  It's not obvious.  They just talk a lot,

15   a lot about nothing.    14:48:55

16          In fact, if you wanted to see what Mr. Simpson is

17   talking about when he talks about fighting, all you have to do

18   is look at the June 17th conversation.  He talks about he has

19   to get out of here because first, number one, I'm tired of

20   living underneath these kaffirs, nonbelievers here.  Here, he's    14:49:15

21   tired of living here underneath all of these nonbelievers.

22          Number two, they are fighting against Allah here.

23   He's saying that here, we are fighting against Allah.  Is there

24   a war against the Muslim government here?  No.  Is there a war

25   against Allah here?  No.    14:49:45

1          There are wars being fought, but they are not literal

2     wars.  They are rhetorical wars.  The war, for example, about

3     the mosque going up in New York City.  The war, for example,

4     against people who are afraid of Muslims when they are praying

5     in the airport.

6          He's not talking about fighting when he's talking

7     about fighting.  It's rhetorical.  And how do we know that?

8     Did he buy any guns?  Do we have any evidence that he's talking

9     about shedding blood or killing anyone.

10         We don't have any of that.  All of these words that

11    they are using can be interpreted in an innocent way and in a

12    noninnocent way.  The way the Government wants you to interpret

13    them is not supported by the evidence.  Because you know what

14    would support, would be an affirmative step, buying weapons,

15    training, going to training camps.

16         This is the FBI.  Do they have any surveillance of

17    him?  Do they have any e-mails of him communicating with the

18    terrorists in the investigation?  Do they have any phone calls?

19    Do they have any wiretaps?  Do they have anything to show that

20    he actually meant that he was going to go over to Al Shabaab?

21    Did you hear one clip where he asked about where he said the

22    words "Al Shabaab"?  Did you hear one clip where he talked

23    about buying guns?  Did you hear one clip about whether he

24    talked about killing people?

25         You didn't hear any of that and if the Government had

1    that evidence, they would have presented it to you.  And they

2    didn't present it to you because they don't have it because

3    that's not -- that's not what he's talking about.  He's talking

4    about the violence that went up to and that still exists in the

5    Muslim religion.  It doesn't have to be external killing,

6    blood, violence.  It's a struggle.  Jihad is a struggle.

7         And you hear him teaching Dabla Deng, who is went --

8    came to him as someone who is new to Islam.  And you hear him

9    teaching about the history of the religion.  You hear him

10   talking about the caliphate, you hear him talking about Abu

11   Bakr and if we lived in that time, then he would have to listen

12   to whatever he said, unless he said to do something bad.  Then

13   we couldn't listen.

14        That's what it says.  If Abu Bakr give you an order to

15   do something, you have to do it.  Have to, unless he tell you

16   to do something bad, which he wouldn't do.  That's what the

17   tape says.

18        The Government wants you to believe that Mr. Simpson

19   had plans to go from South Africa to Somalia.  Their question

20   is -- the evidence is what if -- me and Yahya was talking about

21   me going to South Africa and I make my way up to Somalia.  What

22   if you go to Somalia?  What if?  And you waiting on brother

23   come pick you up.  And what if it was me?

24        So because he said the words Somalia, that means that

25   he's going to go?  He said what if?  Well, what if I weren't to

1  go home tonight?  What if I were to go to Somalia?  That

2  doesn't mean that I'm making plans to go there, you know.  What

3  would mean I'm making plans to go there?  Getting a visa to go

4  there, getting a plane ticket there, getting a plane ticket

5  anywhere.

6  　　　　Their evidence is that he had a plane ticket to go to

7  South Africa and that he didn't just have a passport, which he

8  could go to South Africa on vacation, but that he actually

9  waited for a visa.  If he's just going to bounce, as

10  Mr. Morrissey wants you to believe, why get a visa so that he

11  can stay in South Africa?  Why not just go to South Africa and

12  bounce and head up to Somalia?  It doesn't make sense.

13  　　　　All of these conversations are just a lot of talking.

14  It's a lot of what ifs and we could and we know a lot of

15  people, with no proof, and no evidence and nothing.

16  　　　　We are not in the era of Minority Report.  We don't

17  try and guess what someone's going to do.  We have to have

18  evidence.  This case is about a lot of time and a lot of money,

19  three years, $132,000, and an informant who seems to be a nice

20  kid, but doesn't understand fully what's going on, obviously.

21  And it didn't produce anything.

22  　　　　They didn't have enough for an attempt.  They don't

23  have enough for conspiracy.  They don't have enough for

24  material support.  They had to do something.  They don't have

25  enough evidence to prove that Mr. Simpson knowingly made a

1   false statement, and they don't have enough to prove that the

2   statement as it's charged in the Indictment involved domestic

3   or international terrorism.  He is not guilty of these charges.

4           Do you have any questions of me before I leave?

5           THE COURT:  I don't think so.  Thank you.

6           MR. MORRISSEY:  Your Honor, it was represented to you

7   that these discussions that Mr. Simpson had were not

8   properly -- if properly understood, were not discussions about

9   violence.  And I think that can get quickly resolved by this

10  Court if the Court plays the June 17th, 2009 tape at 17:03

11  where Mr. Simpson says that he sent Yahya, he sent John Sabari

12  a computer link which talks about the permissibility of doing

13  martyrdom operations and how they going to use, they going to

14  use a car with bombs on it.  Mr. Simpson is distributing

15  information about martyrdom operations.

16          If you then would go to the July 31st, 2007

17  conversation and Mr. Simpson says, specifically in talking

18  about fighting jihad, that fighting the kaffir, it's an honor,

19  it's serious, but the reward is high.  If you get shot or you

20  get killed, it's jannah straight away.

21          And Mr. Deng told us that jannah means heaven.  And

22  Mr. Simpson says jannah, that's what we here for, man.

23          So Mr. Simpson is here to get shot or get killed for

24  Allah and go to heaven as a martyr for Allah.

25          Mr. Simpson says:  Jannah, so why not take that route,

1   you know what I mean.

2          And it's at that point that Mr. Deng says:  Well, wait

3   a minute.  You mean here in America or do we have to go

4   outside.

5          And Mr. Simpson, in talking about where we would go to

6   kill or be killed, to get shot and go straight to heaven for

7   Allah, says:  Right now, I'm talking about going out.  You know

8   what I mean.

9          And Ms. Sitton says, well, he only mentioned Somalia

10  twice and she references the May 29th and the October 23rd

11  conversation.  But, of course, in the July 31st, 2007

12  conversation, he talks about his frustration with brothers who

13  don't want to go fight in Palestine, Iraq, and Somalia.

14          THE COURT:  That's in 2007?

15          MR. MORRISSEY:  Correct, that's the July 31st, 2007

16  conversation.

17          THE COURT:  So there's three references to Somalia as

18  opposed to two?

19          MR. MORRISSEY:  Yes.  Government's theory of the case,

20  though, is that as Mr. Simpson spoke of jihad, it became

21  increasingly focused on Somalia.  The Indictment charges that

22  he knowingly made a -- well, that he made -- knowingly and

23  willfully made a false statement because he had spoken on May

24  29th, 2009, and thereafter.  So the proof we are relying on in

25  terms of discussions about Somalia is essentially beginning

1    with May 29th and thereafter, which would, of course, include

2    the October 23rd conversation.

3           THE COURT:  I'm sorry, October 23rd.

4           MR. MORRISSEY:  2009.

5           THE COURT:  All right.  And how many -- maybe you

6    referred to this already.  How many times did he, Mr. Simpson,

7    say "jihad"?

8           MR. MORRISSEY:  Oh, my gosh.  On the portions that the

9    Government played, probably 10 to 15.  On the -- the -- I would

10   note that the defense says, well, we only played snippets.  The

11   entire days of those five days are in evidence.  And if there

12   had been anything helpful to the defense in those hours of

13   conversation, either they would have played it or they would

14   have directed Your Honor to it.

15          MS. SITTON:  Objection, Your Honor.  That's burden

16   shifting.

17          MR. MORRISSEY:  No, it's not.  Well, if it is, let me

18   rephrase it.

19          THE COURT:  Well, if there was something helpful to

20   the Government, you would have pointed it out in those other --

21          MR. MORRISSEY:  My point is, the entirety of those

22   exhibits is in evidence.  And so the argument that somehow that

23   this case was improperly litigated because only short

24   conversations are played, the answer to that is the Government

25   has given you relevant conversations that make it very clear

1   that Mr. Simpson had spoken very close in time to January 7th,

2   2010, about discussions about traveling to Somalia and that

3   when he was asked about that by the FBI, that he made a false

4   statement with respect to those.

5          THE COURT:  But I take it out of the 300 discussions

6   or taped discussions, if there was anything relevant there, you

7   would have highlighted it?

8          MR. MORRISSEY:  Your Honor, in preparing this case,

9   the false statement was January 7th, 2010, and whether or not

10  he knowingly made a false statement then.  I did not review all

11  300 tapes.  If that --

12         THE COURT:  It sounds like the agents didn't either.

13  So I'm just asking you, because they -- the defense makes a

14  point here that there were 300 other discussions, taped

15  discussions.  Well, you've submitted your evidence in support

16  of your count here that you've charged.  And it's six days of

17  taped conversations.

18         MR. MORRISSEY:  Yes.

19         THE COURT:  All right.  And within those you have

20  highlighted and have submitted to the Court or highlighted for

21  reference to the Court the discussions that you think are the

22  most relevant; is that correct?

23         MR. MORRISSEY:  That is correct.

24         THE COURT:  All right.  Tell me, how do I reconcile

25  the agents' testimony?

1        MR. MORRISSEY:  It's easy.  There is no inconsistency.

2   For one thing, if -- there has been a lot of discussion about

3   the grand jury testimony, which, of course, is not particularly

4   relevant at this point.  But the Court looked at the grand jury

5   testimony.  The question was would you describe what happened.

6        The agent had already testified, he was asked whether

7   or not he had discussions about anyone traveling to Somalia and

8   he said no.  So all that was already in and before the grand

9   jury.  And then there was a somewhat garbled answer that talked

10  about discussions and -- and plans.  And that was not the

11  agent's best answer.  And he testified to that.  On

12  cross-examination he said, yeah, that -- that wasn't the best

13  answer.  I think he used the phrase "misspoke."

14       But there is no inconsistency, and here's why.  Both

15  Agent Turner and Agent Hebert testified exactly consistently,

16  that on that day, Mr. Simpson was asked:  Have you had

17  discussions about traveling to Somalia with others.  Or have

18  you had discussion with others about traveling to Somalia.

19       Agent Turner said that when Mr. Simpson was asked

20  that, he wasn't getting a direct answer.  Mr. Simpson didn't

21  answer directly.

22       Agent Hebert testified to exactly the same facts, that

23  the question was asked:  Have you had discussions with others

24  about travel to Somalia, and that a direct answer was not

25  given.  Both agents testified that the only time they got a

1　direct answer to that question was when Agent Hebert asked

2　Mr. Simpson:  "Yes" or "no," have you had discussions with

3　others about traveling to Somalia?  And Mr. Simpson said, "No."

4　　　　There is no inconsistency.  That's exactly what both

5　agents testified to.

6　　　　THE COURT:  Well, just a second, there's no

7　inconsistency.  There's some inconsistencies with Agent Hebert

8　and testimony -- the testimony he provided on three separate

9　occasions that have been discussed.  He testified before the

10　grand jury and he testified at the preliminary hearing or the

11　detention hearing, I believe.

12　　　　MR. MORRISSEY:  Yes.

13　　　　THE COURT:  And then he's testified here in trial.

14　And he testified at the grand jury and I think at the detention

15　hearing consistently there that he specifically asked the

16　defendant whether -- let me find it.  That he specifically

17　asked have you discussed traveling or are you planning to

18　travel to Somalia.  I think that's the way it was worded in the

19　grand jury.  And then at the detention hearing -- is that --

20　　　　MR. MORRISSEY:  I don't completely agree.  Because

21　this -- excuse me.

22　　　　THE COURT:  Well, do you have how he testified then?

23　　　　MR. MORRISSEY:  I do.  Page 12, page 12 of the grand

24　jury.

25　　　　THE COURT:  Yes.

1          MR. MORRISSEY:  "QUESTION:  Did Mr. Simpson

2    specifically deny that he had ever discussed with anyone

3    traveling to Somalia?"

4               "He did deny that."

5               "Was he asked that multiple times?"

6               "He was."

7          And he was, I would point out, asked multiple times,

8    and by that, Agent Hebert was talking about the roundabout

9    fashion and indirect answers.

10          THE COURT:  I understand that, go ahead.

11          MR. MORRISSEY:  The next question, "Was he asked it in

12    'yes' or 'no' format?"

13               "He was.

14          "ANSWER:"  It's in the description, Your Honor, of the

15    answer, that Mr. Hebert says, "Towards the end of the

16    conversation I specifically said I want a 'yes' or 'no' answer.

17    Have you discussed traveling to or are you planning to travel

18    to Somalia?"

19          That's the compound answer that the defense raised.

20    Agent Hebert testified, well, yes, that's what I said in grand

21    jury.  And Agent Hebert was very clear in this courtroom when

22    he testified subject to cross-examination, he clarified that he

23    asked "yes" or "no," didn't ask about plans.  He asked "yes" or

24    "no," have you had discussions about traveling to Somalia.  If

25    the Court doesn't credit that, the Court is finder of fact.

1     But that's what he testified to.

2          THE COURT:  And he testified under oath at the grand

3     jury, too.  And at the detention hearing, correct?

4          MR. MORRISSEY:  Yes.

5          THE COURT:  All right.  And if I recall correctly, or

6     based on what was submitted, it appears the only time when the

7     defendant was asked in a "yes" or "no" format was when he was

8     asked that compound question.

9          MR. MORRISSEY:  No.

10         THE COURT:  Tell me why not.  Where does it say -- or

11    where can you point to to tell me otherwise?

12         MR. MORRISSEY:  Again, Agent Hebert testified at this

13    trial that the "yes" or "no" question was not asked in compound

14    fashion.

15         THE COURT:  Okay.  So he --

16         MR. MORRISSEY:  Can I --

17         THE COURT:  No, let me just ask you this and then you

18    can finish just because I am the Judge.  He was asked -- he

19    said he specifically recalled or specifically at the prior

20    testimony, twice, said that that's how he asked it.  All right.

21    And that was more close in time to when he would have asked the

22    question, wasn't it, than when he testified here at trial?

23         MR. MORRISSEY:  Sure.  Chronologically, yes.

24         THE COURT:  Sure.  Okay.  And why is he so sure now

25    that it wasn't a compound question when he was so clear in the

1  previous times?  And then if it was a compound question, what

2  effect does that have on your case?  Please respond.

3       MR. MORRISSEY:  Okay.  You may need to help me.  I

4  think there was a series of questions there.

5       When you say what evidence, Judge, I said Agent

6  Hebert, which I'll discuss in one second.  Agent Turner, a

7  percipient witness, also testified that it was asked in "yes"

8  or "no," have you had discussions, noncompound fashion.  So

9  even if you had difficulties with Agent Hebert's testimony, you

10 would then go to Agent Turner's testimony, which was not in any

11 way undermined.

12      Let me stay with Agent Hebert.

13      THE COURT:  I thought on cross, didn't Agent Hebert

14 say that he had asked a compound question?

15      MR. MORRISSEY:  No.  No.

16      THE COURT:  Okay.  We are going to both look very

17 anxiously at the transcript with respect to that.  But go

18 ahead.  Please proceed.

19      MR. MORRISSEY:  Getting back to Agent Hebert, I have

20 to say -- well, Agent Hebert was asked in clear fashion in

21 grand jury whether or not Mr. Simpson denied it.  He said, yes,

22 that he was asked that and that he did deny it.  He spoke about

23 him being asked multiple times.  In the answer on -- when he

24 started to describe it, it's clear that Agent Hebert started to

25 talk about in compound fashion.

1     When he was cross-examined about that, that was his

2 opportunity to say what had happened.  This Court can credit it

3 or not credit it.  But he did not testify in grand jury in

4 response to a question:  Did you ask it in compound fashion.

5 He did not say; yes, I did.  He did not, when he was he asked

6 at the detention hearing, say:  Oh, I only asked it in compound

7 fashion.

8     THE COURT:  I'm not saying that he only asked it in

9 compound.

10     MR. MORRISSEY:  Well --

11     THE COURT:  He asked it in other ways, whether he had

12 been to Somalia or was planning on going to Somalia.  And the

13 defendant didn't respond directly to him.

14     MR. MORRISSEY:  I agree that was the testimony.

15     THE COURT:  All right.  And the only time, and we are

16 here on a false statement based on whether he had discussed his

17 travels to Somalia.  And it was based on the question that was

18 asked by the agent, right?  And you submit it was Agent Hebert

19 that asked the question?

20     MR. MORRISSEY:  In "yes" or "no" fashion, both Agent

21 Hebert and Agent Turner testified to that.

22     THE COURT:  No, no.  But only one of them asked the

23 question, and it was Agent Hebert.

24     MR. MORRISSEY:  Only one of them asked the "yes" or

25 "no" question, which I think everybody agrees is the critical

1    question.

2           THE COURT:  Correct.  All right.  And, well, I guess,

3    just what is your response to the argument made by Ms. Sitton

4    when, you know, the critical question here is what's at -- is

5    really the focus of this whole trial.  And isn't there a lack

6    of clarity on what was asked?

7           MR. MORRISSEY:  Judge, you are the trier of fact.

8    If -- I don't think from Agent Hebert's testimony that there is

9    a lack of clarity.

10          THE COURT:  And I want you to tell me why.

11          MR. MORRISSEY:  Because when given the opportunity to

12   testify, he told --

13          THE COURT:  When?

14          MR. MORRISSEY:  Today in -- not today, yesterday in

15   court, in this courtroom, okay?

16          THE COURT:  Not when he was at the detention hearing,

17   because he had an opportunity there, too, right?

18          MR. MORRISSEY:  Okay, Your Honor, may I -- may I talk

19   about what he testified to in this court?

20          THE COURT:  Yes.

21          MR. MORRISSEY:  Okay.  He testified that he was asked

22   "yes" or "no" fashion, and that it was noncompound, and that

23   the answer was no.  And he was cross-examined and he said:  I

24   understand I may not have spoken properly at the grand jury and

25   at the detention hearing, but that's what it was.  And that's

1   how he was asked it.  And if this Court finds the

2   cross-examination, based on the grand jury and based on the

3   detention hearing, to undermine his credibility, then the Court

4   as finder of fact might discount that testimony.

5        I would submit that you had an exceptionally honest

6   witness who was willing to discuss the -- all aspects of that

7   interview, including any flaw in the way he had testified about

8   that interview previously and put his credibility at issue

9   before this Court.  And he testified in this court:  That is

10  how I asked it.  And he was subject to cross-examination.  And

11  if the Court finds that undermines his credibility, then so be

12  it.

13       But I would ask the Court to read all of that

14  testimony and credit Agent Hebert's explanation of exactly how

15  it was asked.

16       In terms of -- and then I would ask the Court to go to

17  Agent Turner's testimony, which is very clear, about how it was

18  asked.  So it is the Government's argument that this compound

19  question is not accurate and not credible.

20       THE COURT:  It's not accurate and not credible even

21  though that's what he testified to at the grand jury.  So

22  you're saying that that's not accurate and not credible?

23       MR. MORRISSEY:  I think that was Agent Hebert's

24  testimony that he misspoke.

25       THE COURT:  Okay.  But you're saying then that was not

1  accurate and not credible?

2       MR. MORRISSEY:  The concept that it had been asked

3  in -- by him in a compound fashion, yeah, is not credible,

4  because that's part of what that trial was about, to test Agent

5  Hebert's rendition of those events.

6       THE COURT:  All right.  And by my asking, I just want

7  to be clear, because I think Mr. Williams was very

8  conscientious as well previously when he made his motion to

9  dismiss this, I'm not attributing any mal intent.  You said

10  that it was based on his honest -- the agent's honest response.

11  Just this is the key, critical question.  And I need to make

12  sure I understand the Government's position with respect to the

13  question if this is the question that was asked of the

14  defendant and that the Government is claiming that was given a

15  false response to.

16       So that's why I'm zeroing in on this, and I think it's

17  very helpful if you can shed light for me on what your position

18  is on trying to reconcile the testimony, not just of

19  Mr. Hebert, Agent Hebert when he testified here, as compared to

20  his prior two versions of what occurred as well as what Agent

21  Turner testified to.

22       MR. MORRISSEY:  And, Your Honor, I can only say to

23  that I appreciate the Court making its record with respect to

24  the Court's thought process and the opportunity to address the

25  Court's questions.

1    THE COURT:  All right.  Now that we've gone through

2  that, let me just ask you this question, and that is:  If it

3  was the compound question that was asked, does that affect your

4  case?

5    MR. MORRISSEY:  If this Court found that Mr. Simpson

6  only said no, when asked have you discussed traveling to or are

7  you planning to travel to Somalia, if this Court found, despite

8  the testimony of Agent Hebert and Agent Turner, that that was

9  the only way the question was asked and a responsive no answer

10  was given, you would still not find that the Indictment was

11  flawed or that Mr. Simpson was not guilty because it is still

12  not a truthful answer.  It is still a false statement.

13    THE COURT:  You're presenting your rebuttal argument

14  and I interrupted you to clarify all of that, or at least to

15  get your response to that whole line of questioning and subject

16  that Ms. Sitton had argued in her closing.  You can resume with

17  your rebuttal at this time.

18    MR. MORRISSEY:  Your Honor, I don't have much more.

19  The argument --

20    THE COURT:  Well, I guess, I'm sorry, just to wrap up

21  this whole issue on the false statement, or at least try to,

22  Ms. Sitton argued what's the evidence that, I guess, it's

23  willful?  We heard the -- she highlighted that we heard the

24  agent say he misspoke, it had been a while since he testified,

25  I guess he hasn't seen or read his grand jury testimony or he

1   did.  I don't know that he -- well, I don't know what the

2   effect of that was.

3        His testimony was different during the trial than it

4   was previously.  Why do we attribute bad intent and willfulness

5   on the part of the defendant when the agent showed up and

6   asked, considering that he, if he made these statements or

7   regarding Somalia and travel to Somalia, they were months

8   before January the 7th of 2010?

9        MR. MORRISSEY:  Okay.  And specific intent in this

10   context means with knowledge that it's false and deliberately

11   saying it's false.  It does, of course, not require evil

12   intent.

13        THE COURT:  Right.

14        MR. MORRISSEY:  The reason this Court should find that

15   he made that false statement with specific intent to speak

16   falsely is because from these recordings, it is clear that this

17   was Mr. Simpson's whole life.  It was life or death.  This was

18   heaven.  Let's get to heaven, jannah.  It is all he talked

19   about.  In every tape, he was talking about --

20        THE COURT:  When you say "in every tape," the six?

21        MR. MORRISSEY:  That we have played, that are the

22   relevant universe of exhibits for this case.

23        In every exhibit, 1 through 5, that we have played for

24   this Court as relevant to its determination, this is the topic

25   of what Mr. Simpson is discussing.

1          So it was clearly a very important topic to

2    Mr. Simpson.  He also, in terms of both why would you think

3    necessarily he wasn't telling that he planned and was

4    deliberate in not telling the truth?  And then you would go to

5    two factors.  You would go to the March 2007 interview in which

6    he specifically declined to speak to the FBI.  So he knew he

7    didn't have to talk to them and he would -- and that they would

8    go away.

9          So the decision to talk to them is a deliberate

10   decision.  The discussion in the November 7th, 2009 recording

11   of getting their stories straight if they are questioned by

12   authorities, and Mr. Simpson says what he's going to do is put

13   it right back at them and ask them, ask the authorities why

14   they are questioning him.  And that's exactly what he did two

15   months later when he was visited by the FBI on January 7th.  So

16   his conduct was consistent with his plan to be not truthful

17   about what he had discussed.

18         THE COURT:  And that's what you base on -- that's the

19   evidence you base your assertion is that that's why the Court

20   should conclude that the defendant did not just misspeak or

21   didn't mis- --

22         MR. MORRISSEY:  And if I can add, it's clear he didn't

23   misspeak, because he was asked multiple times about discussions

24   of travel to Somalia.  No dispute about that.  He only answered

25   once.  But he was asked multiple times.  And it was clear, the

1      Court can infer, from his reluctance to answer that question.

2      He said:  I don't know why you're asking me this.  I don't know

3      why other people would say this.  Because the testimony was

4      that the FBI indicated to him that they knew from others that

5      he likely had had those discussions.  And that's when

6      Mr. Simpson said:  I don't know why other people would be

7      telling you this.  I don't know why you're asking me about it.

8              In other words, it was not an isolated single question

9      that perhaps he had a brain lock and was not conscious of.

10     That is not the scenario and that is not the evidence.  That is

11     not the testimony.

12             So I would combine all of those factors and argue that

13     the Government has proven willfully within the meaning of the

14     statute.

15             Your Honor, a final point.  The defense argued with

16     respect to the -- the lottery money that Mr. Simpson said we

17     can't take that money, and that he -- and the Government would

18     argue that in none of the five exhibits is the Court going to

19     hear any such statement of Mr. Simpson reluctant to use -- use

20     that money.  It's just not there.  I just think that's

21     factually in error.

22             The argument was that Mr. Deng didn't know anybody

23     from the 32nd Street mosque.

24             THE COURT:  Wait just a second.  On the factual -- on

25     the lottery money, didn't Mr. Deng -- or wasn't there some

1  transcript that said it's a sin or something like that to take

2  money?

3      MR. MORRISSEY:  No, there isn't.  The -- there was

4  questions of that --

5      THE COURT:  Oh, okay.

6      MR. MORRISSEY:  -- by Ms. Sitton, I believe, towards

7  Mr. Deng.  The November 7th conversation, Judge, it's clear

8  that they are -- and you can play all of it, you can play more

9  of it than was played in court, they are discussing what is

10  appropriate for that money.  And I believe what the Court would

11  find is the discussion was Mr. Deng could not use that money,

12  but that others could.  But that's -- that's up to the Court's

13  determination.

14      THE COURT:  I thought Mr. Deng agreed with Ms. Sitton

15  on that line of questioning.

16      MR. MORRISSEY:  About sinfulness of the money.  My

17  point is if the Court asked about the extent of discussions, in

18  answering that, I have to address what I know about the

19  November 7th discussion.

20      THE COURT:  But her point was a broader one.  It

21  wasn't just focused on that discussion, but if the FBI did,

22  indeed, you know, try to get him to take this money so that he

23  would -- sort of as a ruse to go to Somalia.  He didn't bite.

24  Why, if he had all this intent, as you were saying?

25      MR. MORRISSEY:  I thought that the testimony from

1    Mr. Deng was also that in fact Mr. Simpson did want some of

2    that money.  But I guess that's where the transcript will

3    control.

4           THE COURT:  And so you don't want to respond to that

5    point if it's true?

6           MR. MORRISSEY:  Oh, broadly that point?

7           THE COURT:  Yeah, that's the point she was making.

8           MR. MORRISSEY:  Sure, I'm sorry, as a matter of

9    argument I'm happy to respond to that point.

10          THE COURT:  Please.

11          MR. MORRISSEY:  Mr. Simpson had a way to get to

12   South Africa.  He had enough resources to get to South Africa.

13   He had a visa.  He had a plane flight.  So he didn't -- he

14   didn't need the money to accomplish at least part one of his

15   plan to get to South Africa.

16          Once he was in South Africa, then it was Mr. Simpson's

17   words about making his way up to Somalia.  And he also spoke to

18   Mr. Deng on October 23rd about getting picked up by the

19   brothers.  In other words, it doesn't appear that he needed

20   much money to further this if he's being picked up by the

21   brothers from missions.  So he's not charged with material

22   support.  I don't think it's a significant point.  He's charged

23   with the false statement.

24          The Government does feel that -- I think it's the

25   wrong inquiry to look at how many overt acts towards a crime

1　he's not charged with he accomplished.  But if the Court goes

2　down that road, he made, by going to -- by having his plans to

3　go to South Africa, and then from South Africa to Somalia, he

4　was pretty far down that road.

5　　　　Finally, the statement was made by Ms. Sitton that

6　nobody had any plans to go anywhere in Africa.  If the Court

7　reviews the November 7th, 2009 tape, Mr. Yong is talking about

8　how he will say that his friend won the lottery when they are

9　going back to Sudan, Mr. Deng's homeland.  That's the same

10　conversation in which Mr. Yong is saying he's ready to roll.

11　So it's just factually not true that there was no discussion of

12　getting overseas and getting to Africa.

13　　　　This case, Your Honor, is about a lot more than just

14　talk.  It is about a false statement in the course of an FBI

15　investigation into international terrorism into whether or not

16　Mr. Simpson and his associates were going to go to Somalia, and

17　Mr. Simpson chose to make a false statement to the FBI.  And

18　that is why he is guilty.

19　　　　THE COURT:  Let me just ask this last question.  If

20　Mr. Simpson had been asked -- I'm just curious what your

21　position would be.  If Mr. Simpson had been asked whether he

22　had ever talked about violent jihad with his friends, and he

23　said no, would that be a misstatement involving international

24　terrorism or false statement involving international terrorism?

25　　　　MR. MORRISSEY:  Depending on how it was asked and

1   whether or not it was in quotes.  He never said the phrase

2   "violent jihad" together in a quote.  His preferred phrase, he

3   said "jihad" a lot.  His preferred phrase was fighting.  And he

4   says that dozens of times.

5          So -- so if I understand the Court's question, if he

6   had been -- if the Government had relied on that, would that

7   have been a false statement?  I think so, but there's a reason

8   that that -- that question was secondary in the interview.

9          Agent Hebert then asked:  So you've never wanted to go

10  fight jihad overseas?  And Mr. Simpson said:  No.  Could that

11  have been charge as a separate count?  Likely it could have

12  been charged.

13         And I would note that Mr. Simpson lied more than once

14  in that interview when he's assuring the FBI that, oh, don't

15  have to worry about this group.  What Mr. Simpson knows at that

16  time is that Mr. Deng has portrayed himself as willing to go

17  back to Africa to fight, and that Mr. Yong, on November 7th,

18  2009, is ready to roll.

19         And Mr. Simpson has said the school is just a front.

20  He was not truthful with the FBI about whether or not they

21  should be concerned about the rest of that group, specifically

22  including Mr. Deng and Mr. Yong.  So it was not his only lie is

23  my other response to that point.

24         THE COURT:  Okay.

25         MR. MORRISSEY:  Thank you.

THE COURT:  Well, I think that concludes the trial
unless there is anything else.  The only thing I wanted to
raise, and I kind of raised it already, I don't know if it's
worthwhile or not.  It sounds like, Mr. Morrissey, you have
looked into this area of the law involving the -- what's been
referred to as the enhancement to the false statement due to
the involvement of international terrorism, and whether there's
any other guidance out there for the Court case wise to shed
light on how other courts have interpreted that term and the
definition as is stated in Section 2331(1).  You have looked at
that and you don't think there's anything else on that?

MR. MORRISSEY:  I both looked and asked for help on
looking.  I don't think the defense found anything.  But if the
Court is open to it, if the Government or the defense finds
anything pretty soon, we would ask, I'm sure, to be able to
file any supplemental briefing.

THE COURT:  Well, why don't we do that.  I'm going to
give you about a week.

MR. MORRISSEY:  Okay.

THE COURT:  Is that -- is that enough, a week or ten
days?

MR. MORRISSEY:  If we didn't find it the first time
and it's out there, we should find it within a week.

And, Your Honor, I would also point out that I've
ordered the transcript of this trial.  And at the risk of

1  sounding like I'm telling the Court how to act like a trier of

2  fact, I would only point out that within a week, the transcript

3  of what the witnesses said would be available to the Court.

4           THE COURT:  Thank you.

5           So if you do find anything within the week, if you

6  could file any supplemental authorities with respect to

7  involvement of international terrorism, and I guess how it has

8  been defined by other courts.  It sounds like there may not be

9  much out there, but especially as it relates to this sort of

10 circumstance.  Otherwise, I think that concludes this matter.

11          Do you have anything else?

12          MR. WILLIAMS:  No, Your Honor, thank you.

13          THE COURT:  No?  All right.  Well, I'll take this

14 matter under advisement.  I'll see if there's any supplemental

15 authorities, and I'll see the transcript.  And then I'll issue

16 an order, thank you very much.

17          (The court stood in recess.)

18                    *    *    *

19

20

21

22

23

24

25

1               C E R T I F I C A T E

6       I, MERILYN A. SANCHEZ, do hereby certify that I am

7 duly appointed and qualified to act as Official Court Reporter

8 for the United States District Court for the District of

9 Arizona.

10       I FURTHER CERTIFY that the foregoing pages constitute

11 a full, true, and accurate transcript of all of that portion of

12 the proceedings contained herein, had in the above-entitled

13 cause on the date specified therein, and that said transcript

14 was prepared under my direction and control.

17       DATED at Phoenix, Arizona, this 31st day of October,

18 2010.

21                     S/Merilyn A. Sanchez

22                     MERILYN A. SANCHEZ, CRR