**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | CR 10-055-PHX-MHM |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| Elton Simpson, | ) | |
| Defendant. | ) | |

On January 13, 2010, a grand jury indicted Defendant Elton Simpson for knowingly and willfully making a materially false statement to the Federal Bureau of Investigation ("FBI"). The indictment also charged that the statement involved international and domestic terrorism. The indictment specified that on or about January 7, 2010, the Defendant falsely stated to special agents of the FBI that he had not discussed traveling to Somalia, when in fact he had discussed with others traveling to Somalia for the purpose of engaging in violent jihad. The Government is charging Mr. Simpson with making a false statement in violation of 18 U.S.C. §1001. The Government is also charging that the false statement involves international or domestic terrorism as defined under section 2331, so that he is eligible for a sentence enhancement pursuant to 18 U.S.C. §1001.

The Defendant waived his right to a trial by jury and elected instead to have a bench trial. Trial was held October 26 and 27, 2010 before this Court. At the close of trial the

1  Court permitted the parties to provide any additional briefing on the issue of whether the
2  false statement involves international terrorism under 18 U.S.C. §1001. The Court issues the
3  following Order.

4      **I.    Findings of Fact**

5  According to the testimony presented at trial, the Defendant Elton Simpson is an
6  American Muslim. In 2006, the FBI in Phoenix began a criminal investigation of Mr.
7  Simpson, because of his association with an individual whom the FBI believed was
8  attempting to set up a terrorist cell in Arizona. The FBI was investigating whether the
9  Defendant, and certain of his associates, might travel to foreign countries to engage in violent
10  jihad. The investigation was part of the FBI's mission to deter and disrupt terrorist acts
11  involving American citizens as authorized by executive order.

12  In May 2005, the FBI engaged an informant, Mr. Daba Deng, who was from Kenya
13  and who knew Mr. Simpson from the mosque he attended. In the fall of 2006, Mr. Deng was
14  asked by the FBI to become friends with Mr. Simpson and get to know him better by
15  presenting himself as an individual who was new to Islam and who sought to learn more from
16  Mr. Simpson. Mr. Deng began to meet with Mr. Simpson three to four times per week and
17  recorded their conversations. Mr. Deng was paid for his work as an informant.

18  During the trial, the Government played some of the taped conversations between the
19  informant, Dabla Deng, and the Defendant. One of these recordings was from July 31, 2007,
20  more than two years before his indictment. In that recording, Mr. Simpson told Mr. Deng
21  that Allah loves an individual who is "out there fighting [non-Muslims]" and making difficult
22  sacrifices such as living in caves, sleeping on rocks rather than sleeping in comfortable beds
23  and with his wife, children and nice cars. Mr. Simpson said that the reward is high because
24  "If you get shot, or you get killed, it's [heaven] straight away." Mr. Simpson then said
25  "[Heaven] that's what we here for...so why not take that route?"
26  / / /
27  / / /
28      At this point Mr. Deng asked:

| | |
|---|---|
| Deng: | What route though? You mean here in America, we can get the reward too, or do you have to be outside? |
| Simpson: | ...right now, I'm talking about going out, you know what I mean?...Because the brothers in like Palestine, and stuff they need help. |

Mr. Simpson then mentioned Palestine, Iraq and Somalia and stated that if "a brother" in Palestine has his house bombed, you should feel like that bomb landed on your house. "You should feel for your Muslim brother no matter where he is." Mr. Simpson then stated that "they trying to bring democracy over there man, they're trying to make them live by man-made laws, not by Allah's laws. That's why they get fought. You try to make us become slaves to man? No we slave to Allah, we going to fight you to the death." Mr. Simpson then mentioned Palestine, Afghanistan and Iraq and stated "Some people they don't believe that they should be over there fighting. That's the problem. That's like a disease in the heart, man. . . [I]t's a small group of brothers who can see and understand why...Some brothers don't have the same understanding."

In another recording from May 29, 2009, Mr. Simpson told Mr. Deng "it's time to go to Somalia, brother...we know plenty of brothers from Somalia." Mr. Simpson and Mr. Deng then discussed their possible contacts in Africa. Mr. Simpson then said "It's time. I'm tellin' you man. We gonna make it to the battlefield...it's time to roll." Mr. Simpson and Mr. Deng then discussed "jihad". In that conversation, Mr. Simpson explained why Muslims are fighting, the following way: "People fighting and killing your kids, and dropping bombs on people that have nothing to do with nothing. You got to fight back you can't be just sitting down...smiling at each other..." The two then discussed a video of a beheading.

Then on June 16, 2009, six months before he was indicted, Mr. Simpson mentioned to Mr. Deng "Getting up out of here". Mr. Simpson said he was tired of living under non-Muslims. Mr. Simpson also said that non-Muslims are fighting against Allah and that his money and taxes are going towards their weapons. Later in the same conversation, Mr. Simpson discusses having sent someone a link to a video about the permissibility of doing martyrdom operations. He says that someone in the video talks "about how they gonna use

1  the car with the bombs on it."  Mr. Simpson then discussed a lecture, by (presumably former
2  President) Bush about the Caliphate – which Mr. Simpson described as a system based on
3  Shariah law for all Muslims -- and Shariah government.  According to Mr. Simpson,
4  President Bush said that the Caliphate was evil.  Mr. Simpson said that Muslims had the
5  Caliphate over 80 years ago, but that the non-Muslims destroyed that.  He also explained
6  "that's what the Muslims are trying to do right now.  They're trying to bring that back."  Mr.
7  Simpson also said that President Bush said "you're either with us or you're with the
8  terrorists...Bush is either saying you're with us or you're with the Muslims.  That's what that
9  means.  The . . .true Muslims."

10       Then on October 23, 2009, about two months before he was indicted, Mr. Simpson
11  told Mr. Deng:

12       Me and Yahya was talking about... me going to South Africa and then uh, I
         make my way up to, uh Somalia, and uh he said..."what if you go to Somalia
13       and you waiting on a brother come pick you up and what if it was me?"

14  Mr. Simpson then said that Somalia is eight countries away from South Africa and that this
15  was a lot of traveling, suggesting that even if he had the intention to go there, it was far.
16  Then on November 7, 2009 Mr. Simpson, speaking to Mr. Deng and a group of others stated:

17       Deng:      You never know if one day he's going to be a scholar,...
                    you never know if he is going to be mujahid[1],...
18
         Simpson:   Yeah, that's the whole point.  School is just a front.
19                  School is just a front and if I am given the opportunity
                    to bounce...
20
    Later in the same conversation, another person says "we got to come up with what we gonna
21
    say. In case they stop us." Mr. Simpson responds: "I already know.  It's so much simpler than
22
    what it seems."  He goes on to say "You say...I'm just trying, trying to travel, trying to see
23
    the world. 'Cause, you got to be, kind of like, relaxed." Then, later he indicated he would say
24
    "How come all you ... asking all these questions and not anybody else in the airport.  Why
25
    did you all pick me?"
26

27  _____
28       [1]The informant Dabla Deng testified that a mujahid is a person who fights.

- 4 -

1    The tapes were played in Court and Mr. Deng, speaking without the assistance of an
2 interpreter, testified and confirmed that the conversations on the tapes were between him and
3 Mr. Simpson and also confirmed that the statements were made. Mr. Deng, however,
4 provided no testimony interpreting the statements, putting them into context or otherwise
5 clarifying what he understood Mr. Simpson to be saying when he made these various
6 statements about making it to the battlefield, expressing support for Muslim brothers all over
7 the world and "going that route" or why he wanted to go to Somalia. Nor did Mr. Deng
8 explain what he understood the Defendant to mean when he said school was a front and he
9 would bounce.

10    FBI Agent Jeff Hebert, who worked with the informant Dabla Deng and listened to
11 the tapes that were played during the trial, also testified about his interpretation of the
12 Defendant's statements. Agent Hebert testified that when Mr. Simpson expressed his support
13 for the establishment of Shariah law, and stated that fighting non-Muslims in other countries
14 was the way to get to heaven and talked about going on the battlefield in Somalia, Mr.
15 Simpson was making clear that he intended to go to Somalia to engage in violent jihad in
16 order to establish Shariah law. He also testified that the Defendant's statement that school
17 was just a front and that he would "bounce" if given the opportunity meant that Mr.
18 Simpson's plans to attend a madrassa in South Africa was a cover for his true intent – to go
19 to Somalia to engage in violent jihad.

20    At the trial, Agent Hebert testified about the current political situation in Somalia.
21 Agent Hebert explained that he obtained this knowledge from attending a seminar at West
22 Point, which briefly covered the subject of Somalia. He explained that he had also attended
23 training seminars at the FBI in Phoenix on the political situation in Somalia. Agent Hebert
24 has also done some of his own reading of books and seen news media regarding Somalia.
25 Agent Hebert testified based on his knowledge that in 2004 the United States and United
26 Nations supported the establishment of a transitional federal government in Somalia. He
27 explained that in approximately 2005, a loose coalition of Islamic groups in Somalia
28 established an organization called the Islamic Courts Union, which used armed conflict to

1  fight the transitional federal government and successfully pushed it out of Mogadishu, the
2  capital of Somalia. According to Agent Hebert, the goal of the Islamic Courts Union was to
3  establish Shariah law in Somalia. Shariah law, according to Agent Hebert, is an all
4  encompassing set of rules that includes criminal, civil and day to day living that a true
5  Muslim must live by. The Islamic Courts Union have a faction called Al Shabaab, which
6  Agent Hebert testified means "the youth" in arabic. According to Agent Hebert, from 2006
7  to the present day, an armed conflict has existed between the transitional federal government
8  and Islamic militants, who have used killings and violence to target the government. Also
9  according to Agent Hebert, militants in Somalia used a suicide bomber to plant a bomb
10 outside the parliament building in Mogadishu and targeted civilian journalists who reported
11 negatively on their activities. Agent Hebert also testified that he watched a video of Osama
12 Bin Laden on the internet website youtube.com urging all true Muslims to support the jihad
13 in Somalia in any way possible by joining the battle themselves or through other means
14 financial and otherwise.      According to agent Hebert, at some point before January 7, 2010,
15 the FBI learned that Mr. Simpson was planning to travel to South Africa to study in a
16 madrassa, which is a religious school. The FBI also obtained confirmation of Mr. Simpson's
17 plans through the Customs and Border Protection database, which maintains airline
18 reservations. On January 7, 2010, three FBI agents, Jeff Hebert, Lance Turner and Wyatt
19 Storm went to the house where Defendant was staying to question him in connection with
20 their investigation. Mr. Simpson came out of the home and agreed to speak with the agents.
21      The agents asked him about his plans to travel to South Africa and whether he planned
22 to travel anywhere outside of South Africa. The Defendant stated that he did plan to travel
23 to South Africa the following week, but denied having any definitive plans to travel
24 anywhere else from that country. When asked why he was traveling to South Africa,
25 Defendant replied that he was going to attend a madrassa. The agents asked him the name
26 of the school and Defendant declined to answer, telling them that because they were the FBI,

1 they already knew.[2] Agent Turner then asked the Defendant whether he had discussed 2 traveling to Somalia from South Africa with anyone. At this point, the Defendant did not 3 give a direct answer, but only stated that he did not know why they were asking him this. 4 Defendant was asked repeatedly whether he had discussed traveling to Somalia, but 5 continued to refuse to answer directly and continued to question why the agents were asking 6 him this. Agent Hebert finally asked Defendant in a yes or no fashion whether he had 7 discussed with anyone traveling to Somalia from South Africa. The Defendant responded 8 no. Agent Hebert also asked Defendant if he wanted to participate in violent jihad, and Mr. 9 Simpson said no.

10 Having heard the tapes in which Mr. Simpson discussed traveling to Somalia from 11 South Africa, Agent Hebert knew that Mr. Simpson was not telling the truth when Mr. 12 Simpson said he had not discussed traveling to Somalia with anyone. Agent Hebert testified 13 that until Mr. Simpson made his false statement, the FBI was not sure whether they needed 14 to be concerned about Mr. Simpson's travel plans. Because the Defendant was being 15 deceptive about the possibility of traveling to Somalia, however, the FBI became concerned 16 that Mr. Simpson in fact did intend to go Somalia to engage in violent jihad. As a result, the 17 agents attempted to prevent or disrupt the Defendant's travels. The FBI tried, unsuccessfully, 18 to place Mr. Simpson on the no-fly list. Concerned that Mr. Simpson's associates would be 19 inspired by him and attempt to follow in his footsteps, FBI also prepared to begin 20 interviewing them in the same manner they interviewed Mr. Simpson. The FBI's next step 21 would have been to tell the South African government about Mr. Simpson, but before this 22 happened, the FBI arrested Mr. Simpson and brought him up on charges.

23 Before the grand jury, and again at Mr. Simpson's detention hearing, Agent Hebert 24 testified that he had asked Mr. Simpson "yes or no" whether he had discussed traveling *or* 25 was planning to travel to Somalia, and that it was to this question that Mr. Simpson had 26 answered "no" and made the false statement. At the trial, Agent Hebert testified that he

---

[2] He later left a message for Agent Storm, telling him the name of the school.

- 7 -

1  misspoke before the grand jury and at the detention hearing to the extent he suggested that
2  he had asked a compound question and that the question Agent Hebert asked Mr. Simpson
3  during his interview had simply been "'yes or no" had Mr. Simpson spoken to anyone about
4  traveling to Somalia.  Agent Lance Turner, who also participated in questioning Mr. Simpson
5  on January 7, 2010, testified at the trial and confirmed that Agent Hebert had not asked a
6  compound question, but had simply asked Mr. Simpson "yes or no" had he spoken to anyone
7  about traveling to Somalia from South Africa and that Mr. Simpson had answered "no" to
8  that question.

## II. Conclusions of Law

### A. False Statement

To establish that the Defendant has made a false statement in violation of 18 U.S.C. §1001, the Government must prove, beyond a reasonable doubt the following elements: 1) that the Defendant made a statement; 2) that the statement was false; 3) that the Defendant acted willfully and with knowledge that the statement was untrue; 4) that the statement was material; 5) and that the matter is within the jurisdiction of the federal investigative agency. United States v. Jiang, 476 F.3d 1026, 1029 (9th Cir. 2007).  That Defendant made a statement to the FBI, while the FBI was investigating him about possible involvement in international terrorism is not in question.  Therefore, the first and fifth factor do not warrant discussion here.  The Court will rather focus on the elements of falsity, willfulness and materiality.

With regard to falsity, the Government claims that the Defendant made a false statement when he answered "no" when asked whether he had discussed traveling to Somalia. Indeed, Mr. Simpson had previously discussed going to Somalia from South Africa.  He told Mr. Deng on October 23, 2009 that he had a conversation with an individual he referred to as "Yahya" about going to South Africa and then making his way up to Somalia.  So if Mr. Simpson denied having discussed traveling to Somalia, he made a false statement.

The Defendant has argued that the Government has not proved beyond a reasonable doubt that Mr. Simpson made a false statement, because it is not clear that what question he

- 8 -

1  was asked, so that it is not clear that the Defendant denied having discussed traveling to
2  Somalia. The Defendant points to Agent Hebert's testimony before the grand jury and during
3  Mr. Simpson's detention hearing as evidence that the question Agent Hebert asked may have
4  been an ambiguous compound question about whether Mr. Simpson was planning to travel
5  *or* had discussed traveling to Somalia, so that the denial was not a false statement. Based on
6  the testimony and evidence presented at trial, however, the Court finds that the Government
7  has proved beyond a reasonable doubt that Agent Hebert asked Mr. Simpson "yes or no"
8  whether he had discussed traveling to Somalia and that the Defendant made a false statement
9  when he answered no. Agent Hebert testified credibly during trial that this was the question
10 posed to the Defendant and the testimony of Agent Turner, who was present during the
11 questioning, confirmed this. The Court, therefore, finds that Mr. Simpson did make a false
12 statement when he denied having discussed traveling to Somalia.

13       To the extent Agent Hebert's testimony before the grand jury and at the Defendant's
14 detention hearing raises doubts about the actual question that was asked, "the existence of
15 some ambiguity in a falsely answered question will not shield the respondent from a perjury
16 or false statement prosecution." U.S. v. Culliton, 328 F.3d 1074, 1078 (9th Cir. 2003). The
17 trier of fact determines which of the plausible interpretations of an ambiguous question the
18 defendant comprehended and responded to. United States v. Matthews, 589 F.2d 442, 445
19 (9th Cir. 1978) Even if Agent Hebert had asked Mr. Simpson whether he planned to or had
20 discussed traveling to Somalia, the question in its compound form would still be asking Mr.
21 Simpson in part whether he had discussed travel to Somalia, so that an answer of "no" would
22 still constitute a false statement.

23       As for wilfulness, the agents repeatedly asked Mr. Simpson whether or not he
24 discussed traveling to Somalia and the Defendant gave evasive answers, apparently not
25 wanting to answer this question. When asked in a "yes or no" fashion, however, whether he
26 discussed traveling to Somalia, the Defendant stopped being evasive and clearly answered
27 "no". The Court, therefore, finds that the Government proved that the Defendant acted
28 willfully in making the false statement.

1  With regard to materiality, a false statement is material if it could have influenced the agency's decisions or activities. See United States v. Gaudin, 515 U.S. 506, 512 (1995) (whether statement is material depends on what decision an agency was trying to make). Here the Government established that because of the Defendant's false statement, they attempted to place him on the "no fly" list and felt compelled to question his friends and associates to ensure they did not have similar plans. That is sufficient to establish materiality.

The Court, therefore, finds that the Government has met its burden in establishing that the Defendant made a false statement in violation of 18 U.S.C. §1001.

**B.     Whether the False Statement Involves International Terrorism**

The Government also charges that the Defendant's false statement, that he had not discussed with anyone traveling to Somalia, involves international terrorism, so that under the statute, he is eligible for sentence enhancement. 18 U.S.C. § 1001, provides that one who makes a false statement:

> shall be fined under this title, imprisoned not more than 5 years, **or if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both**.

(emphasis added.)   18 U.S.C. § 2331(1), in turn, states that the term "international terrorism" means activities that:

> (A)  **involve violent acts or acts dangerous to human life** that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> (B)  **appear to be intended**–
>   (i)   **to intimidate or coerce a civilian population**;
>   (ii)  **to influence the policy of a government by intimidation or coercion**,
>   (iii) **or to affect the conduct of a government by mass destruction, assassination, or kidnaping; and**
>
> (C)  occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or . . .[where perpetrators seek asylum]

(emphasis added).

1       There is no controlling law concerning what the Government must prove to establish
2  that a false statement "involves" international terrorism to trigger the sentence enhancement.
3  The Government argues that the definition of international terrorism under this statute is
4  broad because it was part of a broad effort to combat terrorism, wherever it can be effective.
5  The Government cites <u>Boim v. Holy Land Foundation</u>, 549 F.3d 685 (7th Cir. 2008) in
6  support of its claim that the Defendant's false statement involves international terrorism.  In
7  <u>Boim</u>, the Seventh Circuit Court of Appeals held, in an opinion written by Judge Posner, that
8  providing financial assistance to a terrorist group constituted an act of terrorism under  18
9  U.S.C. § 2331.  549 F.3d at 689.  The Court held that giving money to a terrorist
10 organization, "like giving a loaded gun to a child (which also is not a violent act), is an act
11 'dangerous to human life'", under the statute. <u>Id</u>.  The Court also found that to be liable under
12 section 2333, the defendant must have known that the money would be used in preparation
13 for or in carrying out the killing of attempted killing of, conspiring to kill or inflicting bodily
14 injury.  <u>Id</u>. at 693.  Since "merely" giving money to a terrorist organization knowing the
15 money will be used to carry out violence can constitute international terrorism under the
16 statute, the Government argues, lying about having discussed traveling to Somalia, when the
17 reason for the travel and the lie is a plan to engage in international terrorism also qualifies,
18 even if the false statement itself is not a violent act

19      The problem, however, is that the Government has not established with the requisite
20 level of proof, that the Defendant's potential travel to Somalia (and his false statement about
21 his discussions regarding his travels) was sufficiently "related" to international terrorism.
22 Rather, the Government missed several steps to meeting its burden for establishing this
23 charge.  As a result, the Court cannot find the Defendant eligible for the sentence
24 enhancement.

25      As an initial matter, the only evidence the Government offered regarding the political
26 situation in Somalia came from Agent Hebert, who testified that he learned about the country
27 from attending a few seminars and from media such as news reports and youtube videos.  Mr.
28 Hebert's brief testimony on this issue was that an armed conflict has existed between the

1 transitional federal government and Islamic militants who want to establish Shariah law, and
2 that the latter have used killings and violence to target the transitional government. Agent
3 Hebert also testified that militants in Somalia used a suicide bomber to plant a bomb outside
4 the parliament building in Mogadishu and targeted civilian journalists who reported
5 negatively on their activities and struggle in Somalia to establish Shariah.

6       Even assuming that Agent Hebert's testimony was sufficiently authoritative to
7 establish Somalia as a hotbed of international terrorism, the Government did not prove
8 beyond a reasonable doubt that the Defendant's discussions about traveling to Somalia were
9 related to the political situation Agent Hebert described. It is true that the Defendant had
10 expressed sympathy and admiration for individuals who "fight" non-Muslims as well as his
11 belief in the establishment of Shariah law, all over the world including in Somalia. What
12 precisely was meant by "fighting" whenever he discussed it, however, was not clear. Neither
13 was what the Defendant meant when he stated he wanted to get to the "battlefield" in
14 Somalia. The selected conversations between Defendant and the informant played for the
15 Court – some of which took place two years before his indictment -- are individually and
16 together ambiguous on these points. The conversations about school being a "front" and what
17 to say if "they stop us" were similarly without context. The informant, Dabla Deng, who
18 could have provided further clarity on the Defendant's statements through context and
19 interpretation, provided no such clarification, but only confirmed that the statements were
20 made. Agent Hebert's testimony, on the other hand, does attempt to weave the Defendant's
21 various statements into a cogent narrative, explaining that the Defendant sought to go to
22 Somalia to engage in violent jihad to establish Shariah law, that attending the madrassa was
23 a front for this ultimate goal and that the Defendant's discussion about what to say "if they
24 stop us" was a strategy for dealing with questions from authorities when carrying this plan
25 out. But to reach this conclusion, Agent Hebert must make a number of inferential leaps –
26 from Defendant's expressed support of "fighting" of non-Muslims and his support for the
27 establishment of Shariah law, to his sending a video regarding the permissibility of
28 martyrdom operations, to his statement about going to the battlefield in Somalia and his

1 statement that school is a "just a front". It is not uncommon for (and perhaps it is an
2 obligation of) the FBI to make these inferential leaps when conducting their investigations,
3 but the limited evidence presented at trial does not permit the Court to make them to enhance
4 the Defendant's sentence.

5 Because the charge that the Defendant's false statement "involved" international
6 terrorism serves to enhance his sentence, the Government has the same burden for
7 establishing that element as any other element of the crime with which Defendant is charged.
8 "[A]ny fact that increases the penalty for a crime beyond the prescribed statutory minimum
9 must be. . . proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 489
10 (2000). As stated, the Government has not established beyond a reasonable doubt that the
11 Defendant's false statement "involved" international terrorism with the portions of
12 conversations played for the Court, which it had recorded during a period spanning over a
13 year. The Government has not established that the selected statements of the Defendant,
14 presented without further context or explanation, establish beyond a reasonable doubt that
15 the Defendant was or planned to be involved in violent acts dangerous to human life,
16 appeared to be intended to intimidate or coerce a civilian population, influence the policy of
17 a government by intimidation or coercion, or affect the conduct of a government by mass
18 destruction, assassination or kidnapping

19 The Government has, at best, established that the Defendant, who harbors sympathy
20 and admiration for "fighting" non-Muslims abroad and establishing Shariah law, made a false
21 statement about discussing traveling to Somalia. "[A] defendant's abstract beliefs, however
22 obnoxious to most people, may not be taken into consideration by a sentencing judge."
23 Wisconsin v. Mitchell, 508 U.S. 476 (1993) (citing Dawson v. Delaware, 503 U.S. 159
24 (1992)). That the Government has not established that Defendant's false statement
25 "involved" international terrorism is confirmed by the fact that even the FBI agents who
26 heard the conversations with the informant that were played for the Court, were unsure of the
27 dangerousness of Defendant's expressed desire to go to Somalia until he denied having
28 discussed traveling there. While the denial suggests a nefarious purpose, it does not serve as

sufficient proof for this Court that the Defendant's false statement involved international terrorism.

Had the Government proved beyond a reasonable doubt that the reason Mr. Simpson lied about discussing travel to Somalia was because he intended to engage in violent jihad there, even if he had no definite or concrete plan to do so, the Court would have had a more solid basis for finding that Mr. Simpson's false statement involved international terrorism. The possibility that the Defendant did in fact intend to go to Somalia to engage in violent jihad exists, as the Defendant never presented any alternative reason for going there. However, that is not the Defendant's burden and as stated, the Government has not established beyond a reasonable doubt that the Defendant had such intentions. As it is, the Government only established that Mr. Simpson discussed traveling to Somalia and later lied about discussing traveling to Somalia. The Government also established that Mr. Simpson expressed sympathy and admiration for individuals who fight non Muslims – possibly even those who engage in violent jihad in other countries including Somalia -- that he would like to see Shariah law established, and that he believed that fighting non-Muslims would lead to heaven. However obnoxious, troubling or repugnant these beliefs and statements may be, this Court cannot find that sufficient evidence exists to enhance the Defendant's sentence.

**Accordingly,**

**IT IS HEREBY ORDERED**, finding the Defendant guilty of making a false statement in violation of 18 U.S.C. §1001.

**IT IS FURTHER ORDERED**, finding that there is insufficient evidence to support that the false statement "involved" international terrorism.

**IT IS FURTHER ORDERED** directing the Clerk to reassign this case for sentencing purposes.

DATED this 14th day of March, 2011.

_____
Mary H. Murguia
United States District Judge